UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA,

       - against -                        11 Cr. 623 (JG)

AGRON HASBAJRAMI,

              Defendant.

---------------------------------------------------X

# REPLY-MEMORANDUM OF LAW
## IN SUPPORT OF DEFENDANT AGRON HASBAJRAMI'S
## PRETRIAL OMNIBUS MOTIONS

STEVE ZISSOU, ESQ.
42-40 Bell Blvd., Suite 302
Bayside, New York 11361
(718) 279-4500

MICHAEL K. BACHRACH, ESQ.
276 Fifth Avenue, Suite 501
New York, New York 10001
(212) 929-0592

*Attorneys for Defendant Agron Hasbajrami*

Also on the brief: Joshua L. Dratel, Esq.

## <u>Table of Contents</u>

Table of Authorities ............................................................................. iii

Introduction ......................................................................................1

Argument..........................................................................................5

I.      THE GOVERNMENT'S SURVEILLANCE OF DEFENDANT AGRON HASBAJRAMI'S COMMUNICATIONS WAS UNCONSTITUTIONAL..................................................................5

        A.      The Government's surveillance of Agron Hasbajrami's communications violated the Fourth Amendment ...............................5

                1.      The "incidental overhear" rule does not render the warrant requirement inapplicable ................................5

                2.      Even if there is a foreign-intelligence exception, the exception is not broad enough to make the surveillance of Agron Hasbajrami constitutional ...............................15

                3.      The surveillance of Hasbajrami's communications was unreasonable..............................................22

        B.      The Government's warrantless surveillance and interception of Hasbajrami's communications violated Article III ............................30

II.     THE GOOD FAITH EXCEPTION DOES NOT APPLY ...........................35

III.    THE GOVERNMENT'S REDACTION OF CLASSIFIED INFORMATION – NOT MERELY FISA *MATERIAL* BUT LEGAL ARGUMENTS GOVERNED BY CIPA AS WELL – VIOLATES DUE PROCESS IN LIGHT OF PRESENT DEFENSE COUNSELS' SECURITIES CLEARANCES ...................................................40

IV.     HASBAJRAMI IS ENTITLED TO DISCOVERY ......................................46

V.      EARLY DISCLOSURE OF <u>BRADY</u>/<u>GIGLIO</u> MATERIAL, 3500
        MATERIAL, AND RULE 404(b) EVIDENCE IS WARRANTED IN
        THIS CASE ...................................................................................................49

Conclusion ...........................................................................................................50

# Table of Authorities

CASES

Application of President's Comm'n on Organized Crime,
763 F.2d 1191 (11th Cir. 1985) ....................................................................30

Au Yi Lau v. INS,
445 F.2d 217 (D.C. Cir. 1971)......................................................................14

Benitez-Mendez v. INS,
760 F.2d 907 (9th Cir. 1985) .........................................................................14

Booker v. United States,
525 U.S. 738 (2005)...............................................................................32, 33

Brady v. Maryland,
373 U.S. 83 (1963).......................................................................................49

Cellular Telecomms. & Internet Ass'n v. FCC,
330 F.3d 502 (D.C.Cir. 2003).......................................................................46

Chafin v. Chafin,
133 S.Ct. 1017 (2013)..................................................................................31

Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp.,
333 U.S. 103 (1948).....................................................................................31

Clapper v. Amnesty International USA,
133 S.Ct. 1138 (2013)..................................................................................31

Clinton v. City of New York,
524 U.S. 417 (1998).....................................................................................34

DaimlerChrysler Corp. v. Cuno,
547 U.S. 332 (2006).....................................................................................31

Davis v. United States,
131 S.Ct. 2419 (2011).............................................................................39, 40

Delcourt v. Belgium,
Application No. 2689/65 (ECHR 1970) ........................................................42

Faretta v. California,
422 U.S. 806 (1975).....................................................................................42

Flast v. Cohen,
392 U.S. 83 (1968).......................................................................................34

Franks v. Delaware,
438 U.S. 154 (1978)................................................................................48, 49

Giglio v. United States,
405 U.S. 150 (1972)................................................................................49, 50

Griffin v. Wisconsin,
483 U.S. 868 (1987).....................................................................................16

In re Directives,
551 F.3d 1004 (FISCR 2008) ............................................................. *passim*

In re Sealed Case,
310 F.3d 717 (FISCR 2002) ......................................................................20, 34

In re Summers,
325 U.S. 561 (1945).....................................................................................31

Klinger v. Conan Doyle Estate, Ltd.,
755 F.3d 496 (7th Cir. 2014) .......................................................................32

Kuopila v. Finlada,
Application No. 27752/95 (ECHR 2000).......................................................42

Mistretta v. United States,
488 U.S. 361 (1989)................................................................................33, 34

Morrison v. Olson,
487 U.S. 654 (1988)................................................................................34, 35

Muskrat v. United States,
219 U.S. 346 (1911)...................................................................33

New Jersey v. T.L.O.,
469 U.S. 325 (1985)...................................................................16

Norvell v. Sangre de Cristo Dev. Co., Inc.,
519 F.2d 370 (10th Cir. 1975) ...................................................32

[Redacted], [Docket No. Redacted],
2011 WL 10945618 (FISC Oct. 3, 2011) ...................................10, 11, 34, 38,
49

Riley v. California,
134 S.Ct. 2473 (2014)...................................................11, 12, 27

Scott v. United States,
436 U.S. 128 (1978)...................................................................29

Skinner v. Railway Labor Execs.' Ass'n,
489 U.S. 602 (1989)...................................................................19

Snyder v. Massachusetts,
291 U.S. 97 (1934).....................................................................42

United States v. Bran,
950 F. Supp.2d 863 (E.D.Va. 2013) ..........................................44

United States v. Burlington N. R.R. Co.,
200 F.3d 679 (10th Cir. 1999) ...................................................31

United States v. Cotterman,
709 F.3d 952 (9th Cir. 2013) .....................................................26

United States v. Daoud,
755 F.3d 479 (7th Cir. 2014) .....................................................48

United States v. Davis,
598 F.3d 1259 (11th Cir. 2010) .................................................39

United States v. Donovan,
429 U.S. 413 (1977)......................................................................................9

United States v. Drake,
2011 WL 2175007 (D. Md. 2011)................................................................44

United States v. Duka,
671 F.3d 329 (3d Cir. 2011) .......................................................................20

United States v. Figueroa,
757 F.2d 466 (2d Cir. 1985) .........................................................................8

United States v. Flores-Montano,
541 U.S. 149 (2004)....................................................................................26

United States v. Fruehauf,
365 U.S. 146 (1961)....................................................................................31

United States v. Ganias,
755 F.3d 125 (2d Cir. 2014) ............................................................29, 39, 40

United States v. Garey,
2004 WL 2663023 (M.D.Ga. 2004) ...........................................................44

United States v. Ghailani,
Docket No. 98 Cr. 1023 (LAK),
2010 WL 4006381 (SDNY 2010) ............................................................1, 3

United States v. Giordano,
416 U.S. 505 (1974)....................................................................................35

United States v. Hung,
629 F.2d 908 (4th Cir. 1980) ......................................................................20

United States v. Jones,
132 S.Ct. 945 (2013)...............................................................................11, 12

United States v. Kahn,
415 U.S. 143 (1974).......................................................................................8

United States v. Knotts,
460 U.S. 276 (1983)...................................................................................12

United States v. Kwai,
411 F.2d 683 (D.C. Cir. 1969)....................................................................15

United States v. Leon,
468 U.S. 897 (1984)...................................................................................37

United States v. Mohamud,
No. 3:10-CR-00475,
2014 WL 2866749 (D.Or. June 24, 2014)....................................................11

United States v. Moussaoui,
382 F.3d 453 (4th Cir. 2004) ......................................................................44

United States v. Paracha,
2006 WL 12768 (SDNY 2006) ...................................................................44

United States v. Ramsey,
431 U.S. 606 (1977)...................................................................................26

United States v. Rodriguez,
532 F.2d 834 (2d Cir. 1976) .......................................................................14

United States v. Sattar,
2003 WL 22137012 (SDNY Sept. 15, 2003) ...............................................19

United States v. U.S. Dist. Court for the E. Dist. of Mich.,
407 U.S. 297 (1972) (cited herein as, "Keith") .................................16, 17, 34

United States v. Verdugo-Urquidez,
494 U.S. 259 (1990)..............................................................................14, 15

United States v. Voustianiouk,
685 F.3d 206 (2d Cir. 2012) .......................................................................40

United States v. Yannotti,
399 F.Supp.2d 268 (SDNY 2005) ................................................................9

W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP,
549 F.3d 100 (2d Cir. 2008) ............................................................31

STATUTES AND OTHER AUTHOTITIES

18 U.S.C. § 3500.....................................................................49, 50

50 U.S.C. § 1881a..............................................................6, 30, 37

50 U.S.C. § 1806.....................................................35, 37, 38, 46

9th Cir. Rule 36-3 ...........................................................................11

Fed.R.Crim.P. 404 ...............................................................49, 50

Fourth Amend., U.S. Const. .................................................. *passim*

Fifth Amend., U.S. Const. ..........................................1, 3, 40, 41,
42, 44, 46

Sixth Amend., U.S. Const...........................................................42

Art. III, U.S. Const....................................................2, 30, 31, 32,
33, 35

Title III ...............................................................10, 28, 29

Classified Information Procedures Act ........................3, 40, 43, 44

FISA Amendments Act ......................................................... *passim*

Foreign Intelligence Surveillance Act................................. *passim*

Protect America Act ...........................................5, 7, 20, 23,
29, 39

H.R.Rep.No. 110-373(I) ...............................................................15

S.Rep.No. 95-701 ...............................................................17, 46

Letter from Benjamin R. Civiletti, Attorney General, U.S. Dep't of
Justice, to The Vice President (1979) (available at
<http://www.fas.org/irp/agency/doj/fisa/1979rept.html>) ...........................44

*FISA for the 21st Century: Hearing Before the S. Comm. on the
Judiciary*, 109th Cong. at 9 (2006) (available at
<http://1.usa.gov/1kbgHm3>) ........................................................................6

FISA Annual Reports to Congress 1979–2007, Foreign Intelligence
Surveillance Act, Fed'n of Am. Scis. (available at
<http://bit.ly/1cvnUef>) ...............................................................................18

Foreign Intelligence Surveillance Act Orders 1979–2012, Elec.
Privacy Info Ctr. (available at <http://bit.ly/LoZqZG>) .............................18

Glenn Greenwald, *XKeyscore: NSA Tool Collects 'Nearly Everything
a User Does on the Internet'*, Guardian, July 31, 2013 (available at
<http://gu.com/p/3hy4h>) .............................................................................24

Letter from Peter J. Kadzik, Principal Deputy Assistant Attorney
General, U.S. Dep't of Justice, to the Hon. Harry Reid, Majority
Leader, U.S. Senate (April 30, 2014) (available at
<http://www.fas.org/irp/agency/doj/fisa/2013rept.pdf>) ...........................44

*Minimization Procedures* at 7 (Oct. 31, 2011) (available at
<http://1.usa.gov/1e2JsAv>)....................................................................8, 23

Letter from Att'y Gen. Michael Mukasey & DNI John M. McConnell
to Sen. Harry Reid, at 3–4 (Feb. 5, 2008) (available at
<http://1.usa.gov/1ihhf9A>). ..........................................................................6

Ellen Nakashima, *Obama Administration Had Restrictions on NSA
Reversed in 2011*, Wash. Post, Sept. 7, 2013 (available at
<http://wapo.st/1hP9FWm>). .............................................................7, 8, 23

President's Review Group on Intelligence & Communications
Technologies, Liberty and Security in a Changing World 149 (Dec.
12, 2013) (available at <http://1.usa.gov/1be3wsO>) ("PRG Report")..11, 13

Privacy and Civil Liberties Oversight Board ("PCLOB"), *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* 114–15 (July 2, 2014) (available at <http://www.pclob.gov/All%20Documents/Report%20on%20the%20Section%20702%20Program/PCLOB-Section-702-Report.pdf>)......................................................................6, 9, 10, 21, 23, 26, 32

Procedures Used by the National Security Agency for Targeting Non-United States Persons Reasonably Believed to be Located Outside the United States to Acquire Foreign Intelligence Information Pursuant to Section 702 of the Foreign Intelligence Sureveillance Act of 1978, As Amended 3 (July 28, 2009) (available at <https://s3amazonaws.com/s3.documentcloud.org/documents/716633/exhibit-a.pdf>) .......................................................................................13

Charlie Savage, *NSA Said to Search Content of Messages to and From U.S.*, N.Y. Times, Aug. 8, 2013 (available at <http://nyti.ms/1cez5ZK>); .........................................................................26

Letter from Deirdre M. Walsh, Dir. of Legislative Affairs, Office of the Dir. of National Intelligence, to Sen. Ron Wyden (June 27, 2014) (available at <http://1.usa.gov/V8lYTo>) ("ODNI–Wyden Letter").........7, 24

## **Introduction**

In a pretrial ruling rendered in <u>United States v. Ghailani</u>, Docket No. 98 Cr. 1023 (LAK), 2010 WL 4006381 (SDNY 2010), the Hon. Louis A. Kaplan suppressed the fruits of an unlawful interrogation, thereby precluding the testimony of the Government's most important witness in a terrorism case involving the deaths of 224 individuals.  In doing so Judge Kaplan remarked, "The Court has not reached this conclusion lightly.  It is acutely aware of the perilous nature of the world in which we live.  But the Constitution is the rock upon which our nation rests.  We must follow it not only when it is convenient, but when fear and danger beckon in a different direction.  To do less would diminish us and undermine the foundation upon which we stand."  <u>Ghailani</u>, 2010 WL 4006381, at *1.

Agron Hasbajrami comes now before this Court in a case involving no deaths or even minimal harm to any individuals, but with equally significant Constitutional implications.  Once again it is the Fourth and Fifth Amendments that serve as the defendant's principle sword and shield to offer protections and remedies for the Government's latest unconstitutional investigative tactics.

Counsel submit the instant reply brief to respond to the Government's unprecedented attempt to radically expand the power of government agents to read and listen to the electronic communications of U.S. persons without a warrant or any other form of individualized judicial review.  No appellate precedent approves

the massive scope of the Government's § 702 surveillance programs, or its misguided claims that the Fourth Amendment's protections are inapplicable once communications have been acquired – irrespective of the fact that the communications are intercepted within the United States and are incepted from United States persons residing in the United States at all relevant times.

Similarly, no appellate precedent allows the Government to inspect the contents of millions of communications of U.S. persons simply because they might relate to the "foreign affairs" of the United States. And no appellate precedent allows the Government to retain, database, query, listen to, read, and disseminate the most private communications of U.S. persons, even though they are written and sent from homes in the United States, simply because the communications were acquired by the Government's dragnet surveillance programs.

Specifically, Agron Hasbajrami's motion to suppress concerns the suspicionless and warrantless surveillance of a U.S. person's international communications under the FISA Amendments Act ("FAA"). This surveillance violated the Fourth Amendment because it occurred without a warrant, without individualized suspicion, and under a program that lacks the limitations that courts have deemed necessary for electronic-surveillance regimes to be reasonable. The surveillance also violated Article III of the Constitution because it proceeded under programmatic orders issued by the Foreign Intelligence Surveillance Court

("FISC") absent any constitutional "case or controversy."  As a remedy, and analogous to <u>Ghailani</u>, this Court should suppress the fruits of that surveillance.

This Court should also require the Government to disclose to cleared defense counsel any and all evidence that would be helpful and material to his defense and that would permit defense counsel to understand and challenge the specific role that the FAA played in the Government's investigation of Hasbajrami.  At a minimum, this Court should require the Government to provide an unredacted (or less redacted) copy of its response brief so that cleared defense counsel can be in a position to *at least* defend against the Government's *legal arguments* in a manner that complies with both the Due Process Clause of the Fifth Amendment and the specific allowances of the Classified Information Procedures Act.

To avoid repetition, we will not address each of the Government's arguments made in its response, but will address only those arguments that could benefit from further briefing.  To the extent we do not address an issue (or specific motion), we rest on our opening brief, which we believe to have sufficiently articulated the bases for the relief requested therein.

Nonetheless we ask this Court not to lose sight of the broader import of the Government's theory, which is that U.S. persons – defined to include both citizens and lawful permanent residents – have no Constitutionally protected privacy interest in their international communications. To accept the Government's

arguments is to accept that the National Security Agency ("NSA") may collect the international communications of all U.S. persons, individually or in bulk, "incidentally" or directly, without having to answer to the Constitution.

Under the Government's logic, the NSA may record every international phone call and copy every international text message and email. It may search those communications without limitation—for evidence of criminal activity, for foreign-intelligence information, or for anything else the Government may be interested in learning.  The Government endeavors to obscure the implications of its theory; but to accept the theory is to accept a radically reimagined relationship between the governed and their government—one in which every cross-border missive, business transaction, or journalistic investigation takes place under the all-seeing and all-remembering gaze of the executive.

What the Government has undertaken with its § 702 surveillance programs, which have specifically aggrieved Agron Hasbajrami, is simply not what was ever intended by the framers of our Constitution, nor the many jurists who have since sagely developed Constitutional jurisprudence.

For the reasons that follow, as well as those reasons previously advanced in Hasbajrami's opening brief, we respectfully submit that the defendant's pretrial omnibus motions should be granted in their entirety, or, at a minimum, within the alternatives discussed herein.

<u>Argument</u>

I.  **THE GOVERNMENT'S SURVEILLANCE OF DEFENDANT AGRON HASBAJRAMI'S COMMUNICATIONS WAS <u>UNCONSTITUTIONAL</u>**

   A.  **The Government's surveillance of Agron Hasbajrami's <u>communications violated the Fourth Amendment</u>**

      1.  **The "incidental overhear" rule does not render the <u>warrant requirement inapplicable</u>**

The Government contends that "incidental capture of a U.S. person's communications during surveillance that lawfully targets non-U.S. persons abroad" does not trigger the warrant clause of the Fourth Amendment (First Gov't Resp., dated, December 23, 2014 [*ecf* #97], at 40).[1] But the rule the Government cites – sometimes called the "incidental overhear" rule – has no application here.

First, the surveillance of the communications of U.S. persons under the FISA Amendments Act ("FAA") is not merely "incidental."  As discussed in the Brief of *Amici Curiae*, Intelligence officials who advocated passage of the FAA (and of the Protect America Act ["PAA"] before it) indicated that their principal aim was to allow the Government broader authority to monitor Americans'

---

[1]    The Government's Memorandum, dated, December 23, 2014 (*ecf* #97), is cited herein as, "First Gov't Resp."  The Government's Memorandum, dated, December 24, 2014 (*ecf* #98), is cited herein as, "Second Gov't Resp."  The defendant's opening brief, dated, November 26, 2014 (*ecf* #92), is cited herein as, "Defendant's Omnibus Motions".  And the Brief of *Amici Curiae* American Civil Liberties Union and Electronic Frontier Foundation in Support of Defendant's Motion to Suppress, dated, December 5, 2014 (*ecf* #94-1), is cited herein as, "Brief of *Amici Curiae*."

international communications.[2]

When legislators proposed language that would have required the Government to obtain probable-cause warrants before accessing Americans' international communications, the White House issued a veto threat.[3]  One cannot reasonably say that the surveillance of Americans' communications under the FAA is "incidental" when permitting such surveillance was the purpose of the Act.

Nor can one reasonably say that the surveillance of Americans' international communications is "incidental" when the FAA allows large-scale collection of those communications.  While the FAA attempts to prohibit "reverse targeting," the prohibition is narrow – it applies only if the Government's surveillance targets a "particular, known person reasonably believed to be in the United States." 50 U.S.C. § 1881a(b)(2). Outside that narrow prohibition, the statute allows the Government to conduct broad surveillance specifically designed to collect the international communications of U.S. persons who are within the United States at

---

[2]  See, e.g., *FISA for the 21st Century: Hearing Before the S. Comm. on the Judiciary*, 109th Cong. at 9 (2006) (available at <http://1.usa.gov/1kbgHm3>) (statement of NSA Director Michael Hayden) (stating, with respect to the FAA's predecessor statute, that certain communications "with one end . . . in the United States" are the ones "that are most important to us"); Privacy and Civil Liberties Oversight Board ("PCLOB"), *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* 114–15 (July 2, 2014) (available at <http://www.pclob.gov/All%20Documents/Report%20on%20the%20Section%20702%20Program/PCLOB-Section-702-Report.pdf>) ("PCLOB 702 Report") ("Executive and legislative branch officials have repeatedly emphasized to us that, with respect to terrorism, communications involving someone in the United States are some of the 'most important' communications acquired under the program.")

[3]  See Letter from Att'y Gen. Michael Mukasey & DNI John M. McConnell to Sen. Harry Reid, at 3–4 (Feb. 5, 2008) (available at <http://1.usa.gov/1ihhf9A>).

all relevant times. This is precisely how the Government uses the statute, and the Government has acknowledged not only that it collects communications of U.S. persons under the statute but that it uses selectors associated with U.S. persons to search through the communications it collects.  <u>See</u> Letter from Deirdre M. Walsh, Dir. of Legislative Affairs, Office of the Dir. of National Intelligence, to Sen. Ron Wyden (June 27, 2014) (available at <http://1.usa.gov/V8lYTo>) ("ODNI–Wyden Letter") (acknowledging that various agencies, including the FBI, conducted thousands of backdoor searches using U.S. identifiers in 2013 alone); Ellen Nakashima, *Obama Administration Had Restrictions on NSA Reversed in 2011*, Wash. Post, Sept. 7, 2013 (available at <http://wapo.st/1hP9FWm>).

The Government relies heavily on <u>In re Directives</u>, 551 F.3d 1004 (FISCR 2008), a case that examined surveillance conducted under the PAA, not the FAA. Notably, in <u>In re Directives</u> the court found it significant that the Government was *not* amassing the database it is concededly amassing here – let alone querying that database for information about U.S. persons. <u>Id.</u> at 1015.   Indeed, in <u>In re Directives</u>, the court specifically noted, "The government assures us that it does not maintain a database of incidentally collected information from non-targeted United States persons, and there is no evidence to the contrary." <u>Id.</u>  However, since the passage of the FAA it appears that just such a database does now exist.

Notably, in <u>In re Directives</u> the FISCR did not describe the assurances it

received from the NSA about the retention and searching of U.S. persons' communications under the FAA, but in any case those assurances no longer hold true with respect to the FAA.  The Government has publicly acknowledged that the NSA stores information acquired under the FAA for up to five years – including information incidentally collected from U.S. persons – and that it routinely searches that information for communications to, from, or about U.S. persons.  See *Minimization Procedures* at 7 (Oct. 31, 2011) (available at <http://1.usa.gov/1e2JsAv>) (permitting NSA to store collected communications for as long as five years); PCLOB Report at 59 (describing searches for information related to U.S. persons); Ellen Nakashima, *Obama Administration Had Restrictions on NSA Reversed in 2011*, Wash. Post, Sept. 7, 2013 (available at <http://wapo.st/1hP9FWm>).

Second, the "incidental overhear" cases cited by the Government involved surveillance predicated on warrants – that is, they involved circumstances in which courts had found probable cause regarding the Government's targets and had limited with particularity the facilities and communications to be monitored. See, e.g., United States v. Kahn, 415 U.S. 143 (1974); United States v. Figueroa, 757 F.2d 466 (2d Cir. 1985).

The "incidental overhear" rule was invoked where a court had carefully circumscribed the Government's surveillance and limited the Government's

intrusion into the privacy of third parties.  See United States v. Donovan, 429 U.S. 413, 436 n.15 (1977) (holding that while a warrant is not made unconstitutional by "failure to identify every individual who could be expected to be overheard," the "complete absence of prior judicial authorization would make an intercept unlawful"); United States v. Yannotti, 399 F.Supp.2d 268, 274 (SDNY 2005) (finding lawful an incidental intercept because the Government had obtained a judicial warrant that "did not give the monitoring agents unfettered discretion to intercept any conversations whatsoever occurring over the target cell phone"); see also PCLOB 702 Report at 95 ("Where a wiretap is conducted in a criminal investigation pursuant to a warrant, satisfaction of the three requirements of the warrant clause … renders the wiretap constitutionally reasonable – both as to the intended subjects of the surveillance and as to any persons who end up being incidentally overheard, the full range of whom the government can never predict.").

Surveillance conducted under the FAA is not similarly limited. Quite the opposite: the FAA does not require the Government to establish probable cause or individualized suspicion of any kind concerning its targets; it does not require the Government to identify to any court the facilities it intends to monitor; and it does not require the Government to limit which communications it acquires – so long as the programmatic purpose of its surveillance is to obtain foreign-intelligence

information. Surveillance is not particularized, and as such the rule of the "incidental overhear" cases cannot be extended to this context.

Third, the *volume* of communications intercepted "incidentally" in surveillance under the FAA differs dramatically from the volume of communications intercepted incidentally in surveillance conducted under the original Foreign Intelligence Surveillance Act ("FISA") or Title III.  Unlike original FISA and Title III, the FAA allows the Government to monitor individuals without regard to whether those individuals are suspected criminals or foreign agents. See PCLOB 702 Report 116 ("[T]he expansiveness of the governing rules, combined with the technological capacity to acquire and store great quantities of data, permit the government to target large numbers of people around the world and acquire a vast number of communications."). Under the Government's theory, the statute even allows the NSA to scan millions of people's communications for information "about" the Government's targets. The Government's use of the term "incidental" conveys the impression that its collection of the communications of U.S. persons under the FAA is a *de minimis* byproduct common to all forms of surveillance.  But whereas surveillance under Title III or FISA might lead to the incidental collection of a handful of people's communications, surveillance under the FAA invades the privacy of thousands or even millions of people.  See [Redacted], No. [Redacted], 2011 WL 10945618, at *27 (FISC Oct. 3, 2011)

10

(observing that "the quantity of incidentally-acquired, non-target, protected communications being acquired by NSA through its upstream collection is, in absolute terms, very large, and the resulting intrusion is, in each instance, likewise very substantial"); id. at *26 ("[T]he Court must also take into account the absolute number of non-target, protected communications that are acquired.  In absolute terms, tens of thousands of non-target, protected communications annually is a *very* large number."); see id. at *27 (noting that the government collects over 250 million communications each year under the FAA); see also President's Review Group on Intelligence & Communications Technologies, Liberty and Security in a Changing World 149 (Dec. 12, 2013) (available at <http://1.usa.gov/1be3wsO>) ("PRG Report") ("incidental interception is significantly more likely to occur when the interception takes place under section 702 than in other circumstances"); Riley v. California, 134 S.Ct. 2473, 2487-93 (2014) (recognizing that the broad collection of data raises different constitutional questions); United States v. Jones, 132 S.Ct. 945, 963–64 (2013) (Alito, J., concurring) (similar); Jones, 132 S.Ct. at 954–57 (Sotomayor, J., concurring).[4]

The Government's effort to stretch the incidental overhear doctrine to cover

---

[4]     The District Court in United States v. Mohamud erred in finding that incidental collection under the FAA does not "differ sufficiently from previous foreign intelligence gathering to distinguish prior case law" – a finding upon which the court based its conclusion that the FAA "does not trigger the warrant clause."  United States v. Mohamud, No. 3:10-CR-00475, 2014 WL 2866749, at *15 (D.Or. June 24, 2014).  Regardless, besides being from a different Circuit, and not from a higher court, under 9th Cir. Rule 36-3(a), while Mohamud, still unpublished, may be

its dragnet collection of the communication of U.S. persons reflects a view that Constitutional rules and exceptions designed for an era of individualized surveillance can be applied equally to vast programs of suspicionless surveillance. This view quite simply is wrong.  See Riley, 134 S.Ct. 2473; Jones, 132 S.Ct. 945; United States v. Knotts, 460 U.S. 276 (1983).

The Government makes one further argument against application of the warrant requirement: It argues that it would be unworkable because "imposition of a warrant requirement for any incidental interception of U.S. person communications would effectively require a warrant for all foreign intelligence collection" (First Gov't Resp. [*ecf* #97] at 43). This is a red herring. The Fourth Amendment does not require the Government to obtain prior judicial authorization for surveillance of foreign targets merely because those foreign targets might, at some unknown point, communicate with U.S. persons.  However, compliance with the warrant clause requires at least two things: (1) that the Government avoid warrantless acquisition of international communications of U.S. persons where it is reasonably possible to do so, and (2) that it avoid warrantless review of such communications when it collects them inadvertently or incidentally.[5]

_____

cited for its persuasive value, it is not precedential.

[5]      The NSA could implement the first restriction by automatically excluding U.S. phone numbers or internet protocols from its collection.  It could also exclude from its collection any communications sent or received by accounts, addresses, or identifies that it had reason to believe are associated with U.S. persons.  The NSA apparently maintains a list of such accounts, addresses, and identifies to prevent targeting errors; there is no reason that it could not use that

There is no practical reason why these limitations – which have the effect of imposing a warrant requirement only for the international communications of U.S. persons – could not be imposed here.  As discussed in the Brief of *Amici Curiae*, during the debate that preceded the passage of the FAA then-Senator Barack Obama co-sponsored an amendment that would have codified these limitations by prohibiting the Government from (1) acquiring a communication without a warrant if it knew "before or at the time of acquisition that the communication [was] to or from a person reasonably believed to be located in the United States," and (2) accessing the communications of U.S. persons collected under the FAA without a warrant based on probable cause.  <u>See</u> Brief of *Amici Curiae* at 24-25, <u>citing</u>, S.A. 3979, 110th Cong. (2008).   "More recently, the President's Review Group concluded that a warrant requirement should be imposed, and the House of Representatives passed an appropriations bill that would impose one."  Brief of *Amici Curiae* at 25, <u>citing</u>, PRG Report 28–29; H.R. 4870, 113th Cong. § 8127 (2014).   As such, the Department of Justice's present position that it is unreasonable to require a warrant before permitting the use of FAA surveillance in

---

list to protect U.S. persons more fully.  <u>See</u> Procedures Used by the National Security Agency for Targeting Non-United States Persons Reasonably Believed to be Located Outside the United States to Acquire Foreign Intelligence Information Pursuant to Section 702 of the Foreign Intelligence Sureveillance Act of 1978, As Amended 3 (July 28, 2009) (available at <https://s3amazonaws.com/s3.documentcloud.org/documents/716633/exhibit-a.pdf>)    ("[I]n order to prevent the inadvertent targeting of a United States person, NSA maintains records of telephone numbers and electronic communications accounts/addresses/identifies that NSA has reason to believe are being used by United States persons.").

a criminal trial, is itself unreasonable and is contradicted by the views expressed within the Executive and Congressional branches of our government.

Relatedly, the Government's reliance on United States v. Verdugo-Urquidez, 494 U.S. 259 (1990), provides it no respite.  See First Gov't Resp. at 38-39.  The defense acknowledges that under Verdugo-Urquidez a foreign national is not entitled to challenge the lawfulness of a search conducted outside of the United States. That being said, here, Hasbajrami is not a foreign national, and the search occurred within the United States, not outside it.

Further, Verdugo-Urquidez also suggests that foreign citizens are nonetheless covered by the Fourth Amendment prohibition against illegal searches and seizures that take place in the territory of the United States so long as they enter this country voluntarily, as Hasbajrami did, see Verdugo-Urquidez, 484 U.S. at 272-73, and Justice Brennan's dissent remarks that "numerous" Circuit courts – including the Second Circuit – have consistently found that the location of the violation, rather than citizenship forms the basis for Fourth Amendment protection. See Verdugo-Urquidez, 494 U.S. at 283 (acknowledging that "aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections to this country"), citing, e.g., United States v. Rodriguez, 532 F.2d 834, 838 (2d Cir. 1976), Benitez-Mendez v. INS, 760 F.2d 907 (9th Cir. 1985), Au Yi Lau v. INS, 445 F.2d 217, 225 (D.C. Cir.

14

1971), <u>Yam Sang Kwai</u>, 411 F.2d 683, 686 (D.C. Cir. 1969); <u>see also</u> <u>Verdugo-Urquidez</u>, <u>supra</u>, 494 U.S. 259, 278 (1990) (Kennedy, J., concurring) (concluding that a warrant was not required for the search of a non-resident alien's home in Mexico but stating that "[i]f the search had occurred in a residence within the United States, I have little doubt that the full protections of the Fourth Amendment would apply"); H.R.Rep.No. 110-373(I), at 15 n.26 (2007) ("In judging the 'reasonableness' of [a] search, however, the location of the intercept can be as important as the location of the U.S. person under surveillance.") (citing Justice Kennedy's concurrence in <u>Verdugo-Urquidez</u>).

## 2. Even if there is a foreign-intelligence exception, the exception is not broad enough to make the surveillance of Agron Hasbajrami constitutional

Out the outset we note that the Government is wrong to assume binding recognition of the so-called foreign intelligence exception.  To the contrary, we respectfully submit that no "special needs" exception to the warrant requirement supports the surveillance conducted under the FAA.  As a result, even if the foreign intelligence context may justify a modification to the probable cause requirements (as some courts have held with respect to traditional FISA), it does not justify abandoning altogether that requirement.

Courts have recognized an exception to the warrant requirement "in those exceptional circumstances in which special needs, beyond the normal need for law

15

enforcement, make the warrant and probable cause requirement impracticable."
New Jersey v. T.L.O., 469 U.S. 325, 351 (1985) (Blackmun, J., concurring); see
Griffin v. Wisconsin, 483 U.S. 868, 873 (1987) (adopting Justice Blackmun's
"special needs" formulation for the Court). The mere fact that the Government's
surveillance is conducted for foreign intelligence purposes, however, does not
render the warrant and probable cause requirement unworkable.

Any discussion of the lawfulness of warrantless intelligence surveillance
must begin with United States v. U.S. Dist. Court for the E. Dist. of Mich., 407
U.S. 297 (1972) (hereinafter, "Keith"), in which the Supreme Court addressed the
lawfulness of warrantless surveillance conducted by the FBI against individuals
eventually charged with having planned or carried out the bombing of a CIA office
in Ann Arbor, Michigan.  In that case, the Government argued that the warrantless
surveillance was lawful because it had been conducted for intelligence purposes
rather than law enforcement purposes.   The Supreme Court emphatically
disagreed.

Addressing the Government's effort to distinguish intelligence surveillance
from law enforcement surveillance, the Court wrote that "[o]fficial surveillance,
whether its purpose be criminal investigation or ongoing intelligence gathering,
risks infringement of constitutionally protected privacy of speech." Keith, 407 U.S.
at 320.  Addressing the Government's claim that security matters would be "too

subtle and complex for judicial evaluation," it observed that the judiciary "regularly deal[s] with the most difficult issues of our society" and that there was "no reason to believe that federal judges [would] be insensitive to or uncomprehending of the issues involved in domestic security cases." Id. Finally, addressing the Government's contention that the warrant requirement would "fracture the secrecy essential to official intelligence gathering," the Court noted that the judiciary had experience dealing with sensitive and confidential matters and that in any event warrant-application proceedings were ordinarily ex parte. Keith, 407 U.S. at 320–21.

Keith involved surveillance directed at domestic security threats, but its logic applies with equal force to surveillance directed at threats with a foreign nexus—at least when that surveillance sweeps up the communications of U.S. persons (as surveillance conducted under the FAA does), and is conducted inside the United States (as surveillance conducted under the FAA is).

First, intelligence surveillance conducted inside the United States presents the same risks to "constitutionally protected privacy of speech" whether the asserted threats are foreign or domestic. Both forms of surveillance can produce the "indiscriminate wiretapping and bugging of law-abiding citizens" that the Supreme Court feared. See Keith, 407 U.S. at 320–21; see also S.Rep.No. 95-701 at 15, reprinted at 1978 U.S.C.C.A.N. 3973, 3984 (stating Senate Intelligence

17

Committee's judgment that the arguments in favor of prior judicial review "apply with even greater force to foreign counterintelligence surveillance"). The risks are still greater if, as under the FAA, there is no requirement that the Government's surveillance activities be directed at specific foreign agents, or subject to individualized judicial review.

Second, the courts are just as capable of overseeing foreign intelligence surveillance of U.S. persons' communications as they are of overseeing domestic intelligence surveillance of their communications. Indeed, for the past thirty-five years, the courts have been overseeing intelligence surveillance relating to agents of foreign powers because, since its enactment in 1978, FISA has required the Government to obtain individualized judicial authorization – based on probable cause that the target is an agent of a foreign power – before conducting foreign intelligence surveillance inside the nation's borders.

There is nothing unworkable about FISA's core requirement of judicial authorization. Since 1978, the FISC has granted more than 33,000 surveillance applications submitted by the executive branch, and the Government has brought dozens of prosecutions based on evidence obtained through FISA. See, e.g., Foreign Intelligence Surveillance Act Orders 1979–2012, Elec. Privacy Info Ctr. (available at <http://bit.ly/LoZqZG>); FISA Annual Reports to Congress 1979– 2007, Foreign Intelligence Surveillance Act, Fed'n of Am. Scis. (available at

<http://bit.ly/1cvnUef>); United States v. Sattar, 2003 WL 22137012, at *6 (SDNY Sept. 15, 2003) (collecting cases). Our country's experience with FISA also shows that judicial oversight can operate without compromising the secrecy that is necessary in the intelligence context.

Therefore, there is no basis to conclude that the warrant and probable cause requirement is unworkable here. Moreover, other factors weigh against recognizing a special needs exception to the warrant requirement in this context. Most significantly, special needs exceptions have generally been recognized only in contexts in which the search in question was minimally intrusive and the discretion of executive officers was strictly confined. See, e.g., Skinner v. Railway Labor Execs.' Ass'n, 489 U.S. 602, 624 (1989). Such is certainly not the case here. Surveillance under the FAA is exceptionally intrusive, and it is conducted by executive officers who enjoy broad authority to decide whom to monitor, when, and for how long.

Moreover, even if this Court were to determine that a foreign intelligence exception existed in certain contexts, we respectfully submit that the exception is not broad enough to make the Government's surveillance of Hasbajrami constitutional in this case. Each of the cases cited by the Government involve a crucial limitation missing here: the surveillance was directed at foreign powers or their agents and predicated on *an individualized finding of suspicion*; such

unquestionably has not occurred here. See, e.g., United States v. Duka, 671 F.3d 329, 338 (3d Cir. 2011); In re Sealed Case, 310 F.3d 717, 720 (FISCR 2002); United States v. Truong Dinh Hung, 629 F.2d 908, 915 (4th Cir.  1980); see also Brief of *Amici Curiae* (ecf #94-1) at 17-18 (discussing cases).

The Government relies heavily on In re Directives, 551 F.3d 1004 (FISCR 2008), a case that actually underscores Hasbajrami's point.   In re Directives addressed the constitutionality of surveillance directives issued under the PAA, Executive Order 12,333, and certain Defense Department regulations.  Although the PAA did not itself require individualized suspicion or particularity, the surveillance program considered by the Foreign Intelligence Surveillance Court of Review ("FISCR") required both.  See In re Directives, 551 F.3d at 1007 ("The certifications require certain protections above and beyond those specified by the PAA."); id. at 1013-14 (describing a "matrix of safeguards" that included both a particularity and probable cause requirement). Throughout its opinion, the FISCR emphasized this point repeatedly, observing that "[c]ollectively, these procedures require a showing of particularity, a meaningful probable cause determination, and a showing of necessity." In re Directives, 551 F.3d at 1016.

While the FISCR recognized a foreign-intelligence exception to the warrant requirement, that exception was narrow:

> [W]e hold that a foreign intelligence exception to the
> Fourth Amendment's warrant requirement exists when

> surveillance is conducted to obtain foreign intelligence
> for national security purposes and *is directed against
> foreign powers or agents of foreign powers* reasonably
> believed to be located outside the United States.

In re Directives, 551 F.3d at 1012 (emphasis added). The surveillance considered

by the FISCR was premised on an individualized finding of probable cause

documented and certified by the Attorney General himself.  See In re Directives,

551 F.3d at 1014.

The foreign-intelligence exception the Government proposes is far broader

than the one recognized by the FISCR in In re Directives.  Here, the Government

has invoked the foreign-intelligence exception not in defense of surveillance

directed at "foreign powers or agents of foreign powers reasonably believed to be

located outside the United States," but in defense of a statute that permits

surveillance ostensibly "targeted" at *any* non-citizen located outside the United

States while also permitting – indeed, intentionally incorporating – dragnet

surveillance of the international communications of *U.S. persons within the United

States* without individualized suspicion or probable cause.  The FISCR has never

recognized a foreign-intelligence exception sweeping enough to render

Constitutional the surveillance that Hasbajrami challenges here.  See PCLOB 702

Report 90 n.411 (acknowledging that "it is not necessarily clear that the Section

702 [FAA] program would fall within the scope of the foreign-intelligence

exception recognized by [earlier] decisions, which were limited to surveillance

21

directly authorized by the Attorney General, targeting foreign powers or their agents, and/or pursuing foreign intelligence as the primary or sole purpose of the surveillance").

### 3.    The surveillance of Hasbajrami's communications was unreasonable

No exception to the Fourth Amendment's warrant and probable-cause requirements applies here. Even if one did, however, the surveillance of Hasbajrami under the FAA would be unconstitutionally unreasonable. See Brief of *Amici Curiae* (*ecf* #94-1), at 18-25.

The FAA is unreasonable under the Fourth Amendment because it exposes virtually every international communication sent or received by a U.S. person to suspicionless and warrantless surveillance. See Brief of *Amici Curiae* (*ecf* #94-1), at 19-24. It abandons the limits that courts have identified as key to the constitutionality of electronic surveillance statutes, including FISA – individualized suspicion, prior judicial review, and particularity. See also In re Directives, 551 F.3d at 1013 ("[T]he more a set of procedures resembles those associated with the traditional warrant requirements, the more easily it can be determined that those procedures are within constitutional bounds.").

Rather than dealing directly with these defining features of the FAA, the Government argues that the statute is similar to the surveillance program held reasonable in In re Directives; that it is justified because of the Government's

overriding interest in countering terrorism; that U.S. persons have little to no expectation of privacy in their international communications; and that "multiple safeguards" make the FAA reasonable.  The Government's reliance upon <u>In re Directives</u> in this context, however, is misplaced.

The FISCR founded its ruling upon several factors that are absent here, including that, under the scheme considered, the Government could acquire the communications only of "overseas foreign agents," and the determination that each target was a foreign agent was made by the Attorney General himself.  <u>In re Directives</u>, 551 F.3d at 1011, 1014.  Also significant to the reasonableness of the scheme was that the Government maintained that under the PAA it did not "maintain a database of incidentally collected information from non-targeted United States persons," <u>Id.</u> at 1015, something that now exists at least since the passage of the FAA. <u>See</u> *Minimization Procedures* at 7 (Oct. 31, 2011) (available at <http://1.usa.gov/1e2JsAv>) (permitting NSA to store collected communications for as long as five years); PCLOB Report at 59 (describing searches for information related to U.S. persons); Ellen Nakashima, *Obama Administration Had Restrictions on NSA Reversed in 2011*, Wash. Post, Sept. 7, 2013 (available at <http://wapo.st/1hP9FWm>).

None of these factors are present here, and their absence is critical. Since the FAA permits the Government to monitor *any* foreigner overseas and not simply

foreign agents, the FAA eliminates the primary criterion relied upon by every appellate court to find a scheme of foreign-intelligence surveillance reasonable: individualized suspicion.

By transferring targeting authority away from the Attorney General of the United States, the FAA permits low-level NSA analysts to decide whom to target. See also Glenn Greenwald, *XKeyscore: NSA Tool Collects 'Nearly Everything a User Does on the Internet'*, Guardian, July 31, 2013 (available at <http://gu.com/p/3hy4h>) (describing interface through which NSA analysts can initiate FAA surveillance "by clicking a few simple pull-down menus designed to provide both legal and targeting justifications"). And, finally, the FAA permits the Government to assemble "a database of incidentally collected information from non-targeted United States persons," which we now know the Government has in fact assembled. As explained in the Brief of *Amici Curiae*, the Government routinely uses its database, which contains hundreds of millions of communications, to target U.S. persons through so-called "backdoor searches." Brief of *Amici Curiae* (*ecf* #94-1), at 21-22; see also ODNI–Wyden Letter.

Second, the Government's claim that the FAA is "crucial to the government's efforts against terrorism and other threats" (First Gov't Resp. [*ecf* #97] at 59), is an evasion. Hasbajrami does not challenge the Government's warrantless acquisition of foreign-to-foreign communications, only of U.S.-to-

foreign communications.  The real question is whether the Government's interest would be thwarted if it had to demonstrate individualized suspicion or to obtain a warrant before acquiring or reviewing the communications of U.S. persons.  We respectfully submit that it would not.

The Government has not explained how requiring that it demonstrate individualized suspicion or that it acquire a warrant in a handful of cases over a five or six-year period would frustrate its surveillance efforts, particularly given that the Government may conduct such surveillance without a warrant in exigent circumstances.

Third, the Government's claim that U.S. persons have no privacy interest in their international communications, <u>see</u> First Gov't Resp. (*ecf* #97) at 36-37, 61-62, is without support.  If it were true that U.S. persons had no expectation of privacy in their international communications, then the Government could target those communications for surveillance directly. It could dispense altogether with the doublespeak of "incidental collection" and collect and store *every* international call and email of *any* U.S. person.  Accepting the Government's argument would that mean the Government has unfettered discretion to scrutinize every word that crosses the U.S. borders.

The Government appears to be doing something along those lines by scanning nearly every cross-border communication for information "about" its

targets. See Charlie Savage, *NSA Said to Search Content of Messages to and From U.S.*, N.Y. Times, Aug. 8, 2013 (available at <http://nyti.ms/1cez5ZK>); see also PCLOB 702 Report 121–22.  However, the border-search doctrine, relied upon the Government in its response brief (see First Gov't Resp. at 63-64), does not justify the surveillance of communications, and it does not justify the surveillance of them absent individualized suspicion.

The Government attempts to rely upon United States v. Ramsey to suggest that the border-search doctrine applies beyond the context of individuals or property physically at a border.  See First Gov't Resp. at 63, citing, United States v. Ramsey, 431 U.S. 606, 620 (1977).  However, in Ramsey the Supreme Court in fact clarified that the doctrine exists only to serve the Government's interest in "stopping and examining *persons* and *property* crossing into this country," Ramsey, 431 U.S. at 616 (emphasis added); accord United States v. Flores-Montano, 541 U.S. 149, 152 (2004), and thus it cannot be applied as broadly as the Government attempts here.

Indeed, Ramsey, which is the seminal case on the matter, noted that "envelopes are opened at the border only when the customs officers have reason to believe they contain other than correspondence, while the reading of any correspondence inside the envelopes is forbidden." Ramsey, 431 U.S. at 624; see also United States v. Cotterman, 709 F.3d 952, 957 (9th Cir. 2013) (explaining that

"[e]ven at the border, [courts have] rejected an 'anything goes' approach," and requiring reasonable suspicion before a thorough review of a laptop at the border), cert. denied, 134 S.Ct. 899 (2014).

Finally, the Government claims the FAA is reasonable because of "multiple safeguards" in place to protect the privacy of U.S. persons.  As explained in the Brief of *Amici Curiae*, those supposed safeguards are weak and riddled with exceptions.  They permit the Government to target virtually any non-U.S. person for surveillance – even where another party to the communication is a U.S. person, and, for the U.S. persons inevitably swept up by that international dragnet, the only safeguards are minimization procedures that provide little meaningful protection.[6]

Indeed, the Government cites periodically to opinions issued by the FISC, and made public since mid-2013, for purposes of defining certain search, interception, and retention protocols.  However, the Government fails entirely to confront even once the serial, systemic, and serious violations of those very protocols, including minimization requirements, described in those opinions, which occurred during the time period relevant to this case.  See Defendant's Omnibus Motions (*ecf* #92) at 47-66.

The Government's response also inadequately addresses two key facts.

---

[6]     The Supreme Court recently warned against excessive reliance on "government agency protocols" to safeguard Americans' privacy.  See Riley, 134 S.Ct. at 2491 ("[T]he Founders did not fight a revolution to gain the right to government agency protocols.").

First, while FAA surveillance is subject to minimization procedures, the minimization procedures do not account for the FAA's failure to require individualized judicial review at the acquisition stage. Under FISA and Title III, minimization operates as a second-level protection against the acquisition, retention, and dissemination of information relating to U.S. persons; the first level of protection comes from the requirement of individualized judicial authorization for each surveillance target. Under the FAA there is no first-level protection, because the statute does not call for individualized judicial authorization of surveillance targets (or of facilities to be monitored or communications to be acquired). Unlike FISA and Title III, the FAA permits dragnet surveillance of the international communications of U.S. persons. In this context, it is an indictment of the FAA, not a defense, to say, as the Government does, that the FAA's minimization rules are analogous to the minimization rules that apply under FISA and Title III.[7]

Second, unlike the surveillance at issue in In re Directives, FAA surveillance permits the Government to "maintain a database of incidentally collected information from non-targeted United States persons," In re Directives, 551 F.3d at

---

[7] The Government's suggestion that "any electronic communications service provider the government directs to assist in Section 702 surveillance may challenge the lawfulness of that directive in the FISC," and the implication that Yahoo!'s challenge in In re Directives was sufficient to establish that a full adversarial proceeding occurs, see First Gov't Resp. (*ecf* #97) at 34 n.31, is unfounded. The court there was clear that it considered some of the relevant procedures on an *ex parte* basis. See In re Directives, 551 F.3d at 1013.

1015, and to later search that database using the names, email addresses, or other identifiers of U.S. persons.  The Government defends this practice – known as "backdoor searching" – by claiming this practice does not "implicate any reasonable expectation of privacy beyond that implicated in the initial collection" (First Gov't Resp. [*ecf* #97] at 69-70).   This claim is fundamentally flawed. Indeed, if the Government were correct, then the "multiple safeguards" on which it rests its case would be entirely superfluous as a constitutional matter.

Courts uphold the reasonableness of the schemes – as with FISA and Title III – only if those terms are reasonable. See Scott v. United States, 436 U.S. 128, 140-43 (1978) (reviewing surveillance minimization practices for reasonableness); United States v. Ganias, 755 F.3d 125 (2d Cir. 2014) (suppressing evidence where the Government obtained files and searched them for information beyond the terms of the warrant). Here, the minimization procedures in surveillance schemes are a part of the *terms of access*, however the terms of access under the FAA omit a limitation that the FISCR in In re Directives had viewed as essential to the Constitutionality of a much narrower program. See In re Directives, 551 F.3d at 1015 (concluding that the incidental collection of "communications of non-targeted United States persons" under the PAA does not violate the Fourth Amendment because the Government had assured the court "that it does not maintain a database of incidentally collected information from non-targeted United States persons" – a

database that appears to exist since the later inception of the FAA).

Indeed, if the Government conducted one or more backdoor searches of Hasbajrami's communications, such would violate both the Fourth Amendment and the FAA, and it would provide an independent basis for suppression. The FAA prohibits the targeting of a foreigner overseas for the purpose of targeting "a particular, known person" inside the United States. 50 U.S.C. § 1881a(b)(2). Backdoor searching of the Government's extensive database of U.S. persons' "incidentally" collected communications violates 50 U.S.C. § 1881a(b)(2) as well as the Fourth Amendment, by enabling the surveillance of particular, known U.S. persons without a warrant.

**B.    The    Government's    warrantless    surveillance    and interception of Hasbajrami's communications violated Article III**

The FAA violates Article III's "case or controversy" requirement because the statute requires FISC judges to issue advisory opinions addressing the constitutionality of abstract procedures absent concrete facts. See Defendant's Omnibus Motions, dated, November 26, 2014 (*ecf* #92), at 28-30.  The "case or controversy" requirement ensures that Article III courts do "not engage in *adjudicatory or decisional functions* except in those 'cases' and 'controversies' referred to in Article III." Application of President's Comm'n on Organized Crime, 763 F.2d 1191, 1203 (11th Cir. 1985) (emphasis added and quotation marks

30

omitted); see also Chafin v. Chafin, 133 S.Ct. 1017, 1023 (2013) ("Federal courts may not … give 'opinion[s] advising what the law would be upon a hypothetical state of facts' ") (brackets in original and citation omitted).

By limiting the jurisdiction of Article III courts to live, concrete disputes, the "case or controversy" requirement closes the courthouse doors to requests for advisory opinions or "abstract declaration[s] of the law." In re Summers, 325 U.S. 561, 567 (1945); see United States v. Fruehauf, 365 U.S. 146, 157 (1961) (characterizing advisory opinions as "advance expressions of legal judgment upon issues which remain unfocused because they" lack "clear concreteness"); see also Clapper v. Amnesty International USA, 133 S.Ct. 1138 (2013) (declining to rule on the Constitutionality of the FAA specifically because the petitioners lacked standing to challenge the statute and there was, at the time, no proof that a case or controversy existed).

As the Supreme Court recently explained, "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 341 (2006); see Chi. & S. Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 113 (1948); United States v. Burlington N. R.R. Co., 200 F.3d 679, 699 (10th Cir. 1999); W.R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP, 549 F.3d 100, 106 (2d Cir. 2008) (referring to the case or controversy requirement of Article III as a

"bedrock" requirement).[8]

The Government's response also fails to account for the fundamental difference between ex parte review of an application for authorization to conduct a specific search, and the general programmatic authorization that judges undertake under the FAA. In close cooperation with government agents and prosecutors, judges help design programs that result in the search and seizure of the electronic communications of unspecified U.S. persons. See PCLOB hearing at 36 (July 9, 2013) (former FISC Judge Robertson explaining to the Oversight Board that the design of search and seizure programs under the FAA is better viewed as an administrative task of the Executive branch that is outside the judicial bailiwick). Section 702 collection, thus, involves judicial officers in the non-judicial role of designing programs, rather than determining whether, under legislatively or executively-established standards, a particular search and seizure is authorized by law.

In Booker, the Supreme Court reaffirmed the separation of powers limitations that should apply here: "[W]e have not hesitated to strike down

---

[8]     See also Norvell v. Sangre de Cristo Dev. Co., Inc., 519 F.2d 370, 375 (10th Cir. 1975) ("It is fundamental that federal courts do not render advisory opinions and that they are limited to deciding issues in actual cases and controversies. A justiciable controversy is distinguished from a difference or dispute of a hypothetical character or from one that is academic.") (citations omitted); see also Klinger v. Conan Doyle Estate, Ltd., 755 F.3d 496, 498 (7th Cir. 2014) (Posner, J.) ("It would be very nice to be able to ask federal judges for legal advice…. But that would be advisory jurisdiction, which" is "inconsistent with Article III's limitation of federal jurisdiction to actual disputes, thus excluding jurisdiction over merely potential ones….").

provisions of law that either accrete to a single Branch powers more appropriately diffused among separate Branches or that undermine the authority and independence of another coordinate Branch." Booker v. United States, 525 U.S. 738, 755 (2005), citing, Mistretta v. United States, 488 U.S. 361, 382 (1989). When a statute co-opts judges to design Executive programs, and do not place the judges in a position to make their determinations based upon individualized suspicion regarding the specific subjects of Executive interest, the statute violates Article III.  As such, this Court should strike down the FAA since it exceeds the proper functions of the separate branches of government and undermines the independence of the Judiciary.  See Mistretta, 488 U.S. at 380 ("This Court has consistently given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty.").

While it is not required that the three Branches be entirely separate and distinct, Mistretta, 488 U.S. at 380, the outer limit of appropriate congressional delegation to the Judiciary is expressed in Article III of the Constitution, under which "[t]he judicial power of the United States is limited to 'Cases' and 'Controversies.' " Mistretta, 488 U.S. at 385, citing Muskrat v. United States, 219 U.S. 346, 356 (1911).  As the Court in Mistretta explained:

> These doctrines help to ensure the independence of the Judicial Branch by precluding debilitating entanglements between the Judiciary and the two political Branches, and prevent the Judiciary from encroaching into areas reserved for the other Branches by extending judicial power to matters beyond those disputes "traditionally thought to be capable of resolution through the judicial process."

Mistretta, 488 U.S. at 385, quoting, Flast v. Cohen, 392 U.S. 83, 97 (1968); see also Clinton v. City of New York, 524 U.S. 417, 440-47 (1998) (line item veto violated separation of powers by conferring upon the President the power to amend statutes).[9]

The Government's citations to cases upholding ex parte decisions regarding the issuance of surveillance orders in individual cases under FISA are irrelevant. Congress has the power to design warrant analogues to permit surveillance under appropriate legal standards.  See Keith, 407 U.S. at 322-23. However, the FAA involves a quantum leap away from individualized judicial review to generalized programmatic design.

As seen in [Redacted], 2011 WL 10945618, at *1-*3, the judge's review and collaboration with Executive Branch attorneys involves the general design of administrative programs, with no judicial review of any individual acquisition,

---

[9]     Although the FISA Review Court found no problem with the FISC's secret and non-adversarial proceedings regarding specific surveillance orders, the FAA programmatic surveillance implicated here raises precisely the issues of a program that may be "a bureaucratic success story," but would still "have serious constitutional ramifications." In re Sealed Case, 310 F.3d at 732, quoting, Morrison v. Olson, 487 U.S. 654, 684 (1988).

retention, and accessing of the communications of U.S. persons.   See also Morrison, 487 U.S. at 677 ("As a general rule, we have broadly stated that 'executive or administrative duties of a non-judicial nature may not be imposed on judges holding office under Art. III of the Constitution.' ") (citations omitted).

Since Section 702 improperly incorporates the Judiciary into the Executive function of designing search and seizure programs, and compromises the Judiciary's neutrality in judging the application of the programs to a particular individual citizen, it is therefore unconstitutional – facially and as applied.

## II.   THE GOOD FAITH EXCEPTION DOES NOT APPLY

The good-faith exception to the exclusionary rule does not apply to FISA's statutory suppression remedy, and even if it did it would have no application here.

If this Court "determines that the surveillance was not lawfully authorized or conducted, it *shall* . . . suppress the evidence which was unlawfully obtained or derived" from such surveillance. 50 U.S.C. § 1806(g) (emphasis added).  Thus, in the context of the FAA, suppression is required by the statute and "does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights." United States v. Giordano, 416 U.S. 505, 524 (1974).

Even if the good-faith exception applied to 50 U.S.C. § 1806(g), it would not be properly invoked here.  In fact, based upon this Court's prior conclusion that there was "a DOJ policy that transcended this case" to intentionally fail to provide

notice of warrantless FAA surveillance (Order, dated, October 2, 2014 [*ecf* #85], at 6), it is a bit offensive that the Government attempts to assert the "good faith" exception notwithstanding being caught in the ultimate act of bad faith: an intentional cover-up of information that directly led to a defendant's unknowing and unintelligent guilty plea.  (The specific number of defendants that have been affected by the Government's duplicity is not yet known.  To counsel's knowledge there are five defendants that have received belated FAA notices; Hasbajrami and one other received such notice after already having pleaded guilty and been sentenced.)

Indeed, if the Government had truly been acting in good faith during the implementation of the § 702 surveillance programs, why create a DOJ-wide policy to refrain from complying with its statutory notice obligations related to those very same programs?  The answer is simple: because the Government was not certain of the Constitutionality of the program and sought to avoid defending the program for as long as it could.  That's certainly not the conduct of a party acting in "good faith".

The Government goes so far as to argue that "even if some aspect of the collection did not comply with the requirements of Section 702, there is no similar indication of deliberate, reckless, or systemically negligent conduct" (First Gov't Resp. at 82 n.59).  The Government apparently has its head in the sand.  This

Court's finding that there was "a DOJ policy [of statutory non-compliance] that transcended this case" (vis-à-vis the Government's notice obligations), certainly amounts to an "indication of deliberate, reckless, or systemically negligent conduct."

Regardless, even if the Government had not already evinced an inability to follow the law, the good-faith exception announced in United States v. Leon, 468 U.S. 897 (1984), still would not apply here because this case does not involve reliance on an individualized warrant authorizing the search of particularly described communications or locations, as is required to trigger the "good faith" exception to the warrant clause of the Fourth Amendment.  See Leon, 468 U.S. at 920–21.

For FAA surveillance, the FISC approves only general procedures proposed by the Government, and, on the basis of those procedures alone, the Government determines whom to monitor, when, and for how long.  See 50 U.S.C. § 1881a.  No judge approves the target of the surveillance or makes an individualized assessment of probable cause.  Therefore, there is no warrant upon which the Government can rely within the meaning of Leon.

Similarly, reliance on the statute does not justify application of the good-faith exception either.  To so hold would render the § 1806(g) statutory suppression remedy moot when the Government has violated the Fourth

37

Amendment.  To put it another way, it makes no sense that reliance on the terms of an unconstitutional statute functions to erase the suppression remedy explicitly provided by that same statute for unconstitutional searches.

Further, the Government has redacted all portions of its response that presumably address the Government's compliance – or lack of compliance – with the statutory requirements of the FAA itself (i.e., the Government's response to the Defendant's Second Motion – the "Motion to Suppress the Fruits of FAA Surveillance Irrespective of the Constitutionality of the Statute").  As a result, unless this Court directs the Government to provide the defense with an unredacted (or less redacted) brief, only this Court will be privy to whether the Government violated the statute itself during its surveillance of Hasbajrami, which would trigger application of the § 1806(g) suppression remedy.

That being said, at least one FISC opinion *has already found* the Government to have violated the statutory requirements of the FAA *during the very same period of time as the surveillance which intercepted Hasbajrami's communications*. See [Redacted], 2011 WL 10945618, at *9 (FISC Oct. 3, 2011) (finding that the Government's minimization procedures contradicted the FAA's requirements).  Assuming the minimization procedures found infirm in [Redacted], 2011 WL 10945618, were the same procedures relied upon to intercept Hasbajrami's communications, reasonable Government officials "should have

known that the statute was unconstitutional," Krull, 480 U.S. at 355, particularly given its manifest and multiple infirmities.

Finally, reliance on In re Directives – an inapposite opinion of the FISCR – does not justify application of the good-faith exception under Davis v. United States, 131 S.Ct. 2419, 2434 (2011), notwithstanding the Government's argument to the contrary.  Davis suspends operation of the exclusionary rule when the Government conducts a search "in objectively reasonable reliance on binding judicial precedent."  Davis, 131 S.Ct. at 2428–29.  As the Eleventh Circuit initially explained, however, binding judicial "precedent on a given point must be unequivocal."  United States v. Davis, 598 F.3d 1259, 1266 (11th Cir. 2010) (emphasis added), aff'd, 131 S.Ct. 2419 (2011); accord United States v. Ganias, supra, 755 F.3d 125, 140 (2d Cir. 2014).

Here, the sole appellate precedent the Government cites as justifying (for purposes of the "good faith" exception) the surveillance of Hasbajrami, is In re Directives, in which the Foreign Intelligence Court of Review evaluated a distinct and now-expired statute, the PAA, based on different criteria and different facts, including limitations on the surveillance not provided here.  In this regard, In re Directives is not on point, and even if it were the Government fails to explain how an opinion of a non-adversarial court that conducts proceedings in secret and has, to the public's knowledge, convened only twice in its 36-year history constitutes

*binding appellate precedent* within the meaning of <u>Davis</u>.  <u>See</u> <u>Ganias</u>, 755 F.3d at 140 (applying <u>Davis</u> to reverse conviction, holding that "agents did <u>not</u> act in good faith") (emphasis added).

Finally, as explained by the Second Circuit, "It is the Government's burden – not [the defendant's] – to demonstrate the objective reasonableness of the officers' good faith reliance" on *binding appellate precedent*.  <u>Ganias</u>, 755 F.3d at 140, <u>citing</u>, <u>United States v. Voustianiouk</u>, 685 F.3d 206, 215 (2d Cir. 2012); <u>see also</u> <u>Ganias</u>, 755 F.3d at 140, <u>citing</u>, <u>Davis</u>, 131 S.Ct. 2423-24.  Based upon the complete scarcity of appellate review of the FAA, the Government simply cannot meet its burden under <u>Davis</u>, <u>Ganias</u>, and <u>Voustianiouk</u>.

Accordingly, the good-faith exception does not apply in this case.

## III.   THE GOVERNMENT'S REDACTION OF CLASSIFIED INFORMATION – NOT MERELY FISA *MATERIAL* BUT LEGAL ARGUMENTS GOVERNED BY CIPA AS WELL – VIOLATES DUE PROCESS IN LIGHT OF PRESENT <u>DEFENSE COUNSEL'S SECURITIES CLEARANCES</u>

The Attorney General's Declaration and Claim of Privilege, in contending that "it would harm the national security of the United States to disclose or hold an adversary hearing with respect to the FISA materials[,]" is a *non sequitor* because: (1)  Hasbajrami is not requesting an open, public hearing, but simply that his counsel, who possess the requisite security clearance, have access to the materials; and (2) in granting such clearances to present defense counsel – which are, in the

context of the FISA materials, the precise equivalent clearance granted to the prosecutors and court personnel – the relevant United States agencies (i.e., the CIA, NSA, and FBI) have already determined that (a) present defense counsel can have access to classified material at the level these FISA materials possess; *and* (b) it would not harm the national security of the United States to grant present defense counsel access to classified materials at that level.

To conclude otherwise would render defense counsel's security clearances meaningless, and creates a distinction in the level and character of security clearance *that does not exist*.  Indeed, under such circumstances, in which cleared defense counsel – including specifically, present counsel of record – are regularly afforded, in the course of criminal cases, access to extraordinarily sensitive classified information, the Government's refusal to provide the materials to cleared counsel in this instance is tactical and not based on any substantive justification.[10]

The Government's position, in practical terms, reduces defense counsel's clearances to second-class status, and in so doing denies Hasbajrami Due Process guaranteed him by the Fifth Amendment, particularly since it is not merely the FISA material that has been withheld but also numerous and extensive legal

---

[10]     Nor has there been a single reported instance of a breach by defense counsel with respect to information provided pursuant to the Classified Information Procedures Act.

arguments raised throughout the Government's brief.[11]

Notably, we respectively submit that the decision to redact FISA material, while in our opinion inappropriate in this case, is nonetheless qualitatively different than the Government's concomitant decision to also redact legal arguments throughout its brief.  Redacting legal arguments, so that defense counsel cannot reply even in abstract legal terms, violates the Due Process Clause of the Fifth Amendment and the Effective Assistance of Counsel Clause of the Sixth Amendment.  See also Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934) (a defendant [or in Hasbajrami's case, the defendant by and through defense counsel] has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge… [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence…."); Faretta v.

---

[11]   The inequity created by the Government herein implicates the international law principle of "equality of arms," included in Article 6 of the European Convention on Human Rights, described by the European Court of Human Rights as "a fundamental principle of the fair trial." Delcourt v. Belgium, Application No. 2689/65 (ECHR 1970), at ¶ 21 (Article 6 para. 1 provides that "in the determination of his civil rights and obligations or of any criminal charge against him, everyone is entitled to a fair and public hearing within a reasonable time by an independent and impartial tribunal established by law'.") (available at <http://hudoc.echr.coe.int/ sites/eng/pages/search.aspx?i=001-57467#{"itemid":["001-57467"]}>); see also Kuopila v. Finlada, Application No. 27752/95 (ECHR 2000), at ¶ 37 ("equality of arms" prohibited sending police reports only to the prosecutor and not to the defense and holding, "The Court recalls that under the principle of equality of arms, as a feature of the wider concept of a fair trial … each party must be afforded a reasonable opportunity to present one's case in conditions that do not place him at a disadvantage vis-à-vis to his opponent….") (available at <http://hudoc.echr.coe.int/sites/fra/pages/search.aspx?i=001-58784#{"itemid":["001-58784"]}>).

California, 422 U.S. 806, 819 n.15 (1975) ("an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings") (collecting cases).

Indeed, we know of no legitimate legal justification to prohibit cleared defense counsel in this case from *at least* being privy to the legal arguments underlying the Government's claims. Instead, the Government's redactions unfairly elevate the present prosecutorial strategy of the Department of Justice above the national security judgment previously rendered by the relevant national security agencies.

Additionally, the Government's position relies on an anachronism: at the time FISA was enacted, in 1978, it was not contemplated that defense counsel in criminal cases would be granted security clearances enabling them to review classified information, but the Classified Information Procedures Act, enacted two years later in 1980, created a framework for just such access. The statutes – FISA and CIPA – have never been harmonized to account for that fundamental change. Thus, the irreconcilable tension between them has not been reconciled: CIPA provides a functional basis for sharing classified information with cleared defense counsel, but FISA presumes such information is off limits to the defense.[12]

---

[12]  Notably, the Government's reliance on electronic surveillance under FISA has also increased dramatically since the FISA was first enacted. For example, in 1978 the Government obtained 207 electronic surveillance orders under FISA, whereas in 2013 it obtained 1588. See

Also, the provisions and principles of CIPA have been applied to situations involving classified information to which the statute has not technically applied. For example, in United States v. Moussaoui, 382 F.3d 453 (4th Cir. 2004), in which the defendant sought access to persons in U.S. custody overseas for purposes of obtaining exculpatory testimony from them, the Fourth Circuit endorsed employing CIPA in circumstances not strictly covered by the statute. See Moussaoui, 382 F.3d at 472 n.20 (applying CIPA concepts and remedies in a criminal case, without invoking the statute's provisions expressly, because CIPA "provides a useful framework for considering the questions raised"); see also United States v. Paracha, 2006 WL 12768, at *8-9 (SDNY 2006); United States v. Garey, 2004 WL 2663023, at *3-4 (M.D.Ga. 2004); United States v. Drake, 2011 WL 2175007, at *4-5 (D.Md. 2011); United States v. Bran, 950 F. Supp.2d 863, 871 (E.D.Va. 2013). Consequently, even if CIPA did not formally encompass the FISA materials, its provisions and protections (for both the classified information and the defendant's Constitutional rights) are easily and properly applicable to those materials.

We respectfully submit that Due Process also requires the disclosure of any non-sensitive information contained in FISA and/or FAA materials (i.e., any

---

Letter from Peter J. Kadzik, Principal Deputy Assistant Attorney General, U.S. Dep't of Justice, to the Hon. Harry Reid, Majority Leader, U.S. Senate (April 30, 2014) (available at <http://www.fas.org/irp/agency/doj/fisa/2013rept.pdf>); Letter from Benjamin R. Civiletti,

information that has already been officially released or disclosed in another forum, such as in the PCLOB Report, or that is not properly classifiable).  For example, the Government has asserted blanket secrecy over all FAA materials relevant to Hasbajrami's surveillance, but it acknowledges having disclosed at least one version of the NSA's § 702 minimization procedures to the PCLOB, and the PCLOB Report described the FBI and CIA's § 702 minimization procedures as well.  At a minimum, the Government should be required to disclose whether the minimization procedures described in the PCLOB report were the same procedures relied upon in relation to Hasbajrami's surveillance, and if they were not, then the inconsistency should be disclosed as well.  Blanket secrecy simply cannot be justified in this context, as it fails to afford Hasbajrami with a reasonable opportunity to defend against the Government's claims.

Accordingly, we respectfully submit that the Government should be directed to disclose to cleared defense counsel the FISA material in question *and, or at an absolute minimum,* an unredacted (or less redacted) brief that puts defense counsel in a position to *at least* defend against the legal arguments raised – presently in secret – by the Government.

---

Attorney General, U.S. Dep't of Justice, to The Vice President (1979) (available at <http://www.fas.org/irp/agency/doj/fisa/1979rept.html>).

## IV.   HASBAJRAMI IS ENTITLED TO DISCOVERY

The Government contends that this Court's ex parte review of materials at issue in Hasbajrami's motion satisfies the statute and the Due Process Clause. See First Gov't Resp. (*ecf* #97) at 97.   Though the statute empowers this Court to conduct such a review, Hasbajrami has provided the basis for this Court to order disclosure to his counsel, subject to appropriate protective orders.  See, generally, Defendant's Omnibus Motions (*ecf* #92), Motions One, Two, and Five.   Such disclosure is "necessary" under the statute, 50 U.S.C. § 1806(f), and this Court should reject the Government's cramped reading of that term. See Cellular Telecomms. & Internet Ass'n v. FCC, 330 F.3d 502, 509–10 (D.C.Cir. 2003) (explaining that "necessary" has a flexible meaning informed by context and often "mean[s] less than absolutely essential") (internal quotation marks omitted).

The legislative history clarifies that Congress fully intended there to be disclosure and adversary proceedings in at least some FISA cases because, "The defendant's constitutional guarantee of a fair trial could be seriously undercut if he is denied the materials needed to present a proper defense. The committee believes that a just, effective balance has been struck in this section."  S.Rep.No. 95-701, at 59 (1978), reprinted in 1978 U.S.C.C.A.N. 3973, 4028.   Congress contemplated that, "Cases may arise, of course, where the court believes that disclosure is necessary." Id. at 65, reprinted in 1978 U.S.C.C.A.N. at 4034.  The Government's

reading of the statute would foreclose any possibility of such cases arising and frustrate Congress's intent.

As support for the claim that no disclosure is warranted here, the Government cites cases addressing run-of-the-mill surveillance under individualized FISA surveillance orders. But characterizing Hasbajrami's arguments as mere rehashing of these prior cases trivializes the novel complexities. Hasbajrami challenges the Constitutionality of the more complex surveillance program operated under the FAA. No appeals court has addressed the Constitutionality of this statute, nor of collection of particular U.S. persons' communications under it.[13] See, supra, Parts I–II.

Determining the Constitutionality of FAA surveillance of Hasbajrami requires an assessment not only of the statutory scheme, but also of the Government's targeting and minimization procedures, of its application of those procedures, and of complicated, factually contingent questions such as whether and precisely how Hasbajrami's communications were obtained via "about" or "backdoor" searches. Addressing the *as applied* Constitutionality of the surveillance of Hasbajrami's communications requires insight into the surveillance, which is not possible without access to the underlying records.

---

[13]     The Government asserts that the FISA Court of Review's decision in In re Directives settles these issues, but as explained above, in this regard that case is not on point. See, supra, Parts I(A), II.

Surveillance and searches under FISA and the FAA present especially acute difficulties to defendants seeking to vindicate their Fourth Amendment rights under Franks v. Delaware, 438 U.S. 154 (1978).  But that does not mean that the necessity of the Franks procedure in FISA cases is diminished in any way: "Franks serves as an indispensable check on potential abuses of the warrant process, and means must be found to keep Franks from becoming a dead letter in the FISA context."  United States v. Daoud, 755 F.3d 479, 486 (7th Cir. 2014) (Rovner, J., concurring).

The Government concedes that Franks applies to FAA surveillance.  See First Gov't Resp. (ecf #97) at 105.  Although the Government contends that the Court's ex parte review of classified FAA materials permits this Court to fully adjudicate any Fourth Amendment violation, this non-adversarial process provides only a pale shadow of the protection contemplated by Franks. As Judge Rovner explained, "although a court may be able to discover inconsistencies in the FISA materials, its ability to discover false statements and omissions is necessarily limited, as it has only the government's version of the facts…. [A] court cannot conduct more than a limited Franks review on its own." Daoud, 755 F.3dd at 494, 496 (Rovner, J., concurring).

Here, however, the Court need not be hobbled by such limited process. Here, and unlike in Daoud, we have identified evidence, in a declassified FISC

opinion, that the FISC's approval of programmatic FAA surveillance *when his communications were collected under that authority* was tainted by Government misrepresentations of fact. See [Redacted], 2011 WL 10945618 (FISC Oct. 3, 2011). This meets the threshold set by Franks, 438 U.S. at 171–72, and requires disclosure of the Government's application(s) to the FISC (subject to appropriate protective orders) and, potentially, an adversarial hearing on Hasbajrami's motion.

## V.  EARLY DISCLOSURE OF BRADY/GIGLIO MATERIAL, 3500 MATERIAL, AND RULE 404(b) EVIDENCE IS WARRANTED IN THIS CASE

The Government argues, as it always does, that it "is aware of its obligations under Brady v. Maryland, 373 U.S. 83 (1963), and has met and will continue to meet its obligations" (Second Gov't Resp. at 12), as well as that discovery of material governed by Giglio v. United States, 405 U.S. 150 (1972), 18 U.S.C. § 3500 et sec., and Fed.R.Evid. 404(b) is premature (Second Gov't Resp. at 13-16). We respectfully disagree.

The Government has already shown an inability to recognize information favorable to the accused, or, at a minimum, potentially favorable and unquestionably material to the defendant's fundamental right to enter a knowing and voluntarily plea. See Order, dated, October 2, 2014 (*ecf* #85).  As such, we respectfully submit that the general presumption that the Government's mere representation that it understands its obligations and is acting in good faith is

inapplicable where the Government has already shown an inability to recognize its obligations in a timely fashion, or worse, as here, has already been found to have undertaken a DOJ-wide policy to disregard its statutory obligations entirely.

Similarly, early disclosure of evidence and information discoverable under Giglio, the Jenks Act, and Rule 404(b), is warranted in this case in light of the age of this case and the attention – both nationally and internationally – that this case continues to garner.

## Conclusion

WHEREFORE, based upon all of the reasons expressed above as well as those previously had herein, Defendant Agron Hasbajrami, by and through his attorneys, respectfully submits that the defendant's pretrial omnibus motions should be granted in their entirety, or, at a minimum, within the reasonable alternatives discussed herein.

Dated:  New York, New York
       January 9, 2015

Respectfully submitted,

Michael K. Bachrach
Steve Zissou
*Attorneys for Defendant*
*Agron Hasbajrami*

Also on the brief: Joshua L. Dratel, Esq.