

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

SDD/SK/PWB
F.#2011R00783

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

August 11, 2015

<u>By Hand and ECF</u>

The Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York  11201

   Re: <u>United States v. Agron Hasbajrami</u>
     <u>Criminal Docket No. 11-623 (S-2) (JG)</u>

Dear Judge Gleeson:

  The government respectfully submits this memorandum in connection with the defendant's sentencing, which is scheduled for August 13, 2015 at 2:30 p.m.  The defendant's effective Sentencing Guidelines range is 20 years' imprisonment, the statutory maximum available with respect to both counts of conviction.  For the reasons set forth below, based on the seriousness of the defendant's offense conduct and the need to protect the public and deter future like conduct, a sentence of 20 years is within the range of reasonable sentences the Court may impose.  The government incorporates by reference its November 21, 2012 sentencing submission, ECF# 39.

  I. <u>Background</u>

  As set forth in the Presentence Investigation Report ("PSR"), and the government's previous submissions, beginning in 2010, and continuing through 2011, the defendant sent money to an individual overseas ("Individual # 1") with the intent that the funds be used to support the activities of a jihadist fighting group in the Federally Administered Tribal Areas of Pakistan (the "FATA").[1]  Individual # 1 represented that he was fighting against Americans and other westerners in Afghanistan, and that he had

---

[1] The FATA region of Pakistan is home to multiple prominent Islamic terrorist organizations, including, among others, al-Qaeda, the Islamic Jihad Union and Tehrik-i-Taliban Pakistan.

facilitated the travel of numerous individuals to participate in jihad.  During the time period from December 2010 through April 2011, the defendant sent over $1,000 to Individual # 1 in support of violent extremist activity.

In addition, the defendant took substantial steps to join Individual # 1 in the FATA.  Specifically, the defendant told Individual # 1 that he wanted to travel to where Individual # 1 was located and "marry the virgins" – common jihadist rhetoric that refers to the anticipated reward for dying as a martyr while fighting jihad.  While questions remain as to the actual nature of Individual #1's specific conduct overseas, and whether he may have exaggerated or fabricated certain of his actions in order to solicit funds, Individual # 1's stated purpose for raising money and recruiting personnel was unequivocally to support jihadist fighting operations.  The defendant's own communications establish that he understood this stated purpose, and eagerly wished to support those operations.  To be clear, the government refers to these communications not to prove what the defendant's confederates undertook in the cause of jihad, but rather to establish the defendant's state of mind in attempting to support such activity.

On April 7, 2011, the defendant asked Individual # 1 for directions to the location of a jihadist group in the FATA.   In response, Individual # 1 agreed, providing the defendant with plausible, detailed instructions on how to reach him in the North Waziristan region of Pakistan.  Individual # 1 expressly informed the defendant that he could be located through members of Tehrik-i-Taliban Pakistan ("TTP"), more commonly known as the Pakistani Taliban, a designated foreign terrorist organization.  Individual # 1 and the defendant also contemplated that the defendant would need to bring enough money to purchase a weapon.

On May 10, 2011, the defendant received an email from Individual # 1 explaining that "operations" had started and were going well.  In addition, Individual # 1 represented that westerners, including Americans, were being killed and captured every day.  Over the next few months, the defendant pursued a route into the FATA, where he hoped to personally join the fight.  On August 9, 2011, the defendant purchased a one-way ticket to Istanbul, Turkey, via Portugal.  Four days later, the defendant cancelled the ticket, explaining in an email that "the road" to jihad was problematic.   However, the defendant continued to offer support to Individual # 1, stating that he would provide whatever he had left when he arrived.

On September 3, 2011, in an investigative effort to vet the defendant's intent, a confidential source ("CS") working with the Federal Bureau of Investigation ("FBI") sent the defendant an email indicating that the CS could assist the defendant with travel.  The CS indicated that he was a member of the Islamic Jihad Union ("IJU"), a designated foreign terrorist organization that is concentrated in the FATA and that has engaged in and planned attacks on American troops in Afghanistan and other countries.  On September 5, 2011, the CS explained that Individual # 1's group was a different group than the IJU, and that it was the defendant's choice about whether to travel with the assistance of Individual # 1's group or the IJU.  That same day, the defendant purchased a one-way ticket to Istanbul, Turkey,

2

departing on September 6, 2011, from John F. Kennedy International Airport ("JFK") in Queens, New York.

On September 6, 2011, the defendant emptied his bank account, withdrawing $1,340 in cash. That afternoon, the defendant took a cab to JFK, where he was arrested by FBI Special Agents at an international departures terminal. (PSR ¶ 4). At the time of his arrest, the defendant was carrying, among other things, his Albanian passport (with a recently-expired Iranian visa), a tent, boots, and cold-weather gear. (PSR ¶ 4).

After he was arrested, the defendant was interviewed by law enforcement agents. The defendant was informed of, and waived in writing, his Miranda rights. In sum, the defendant was cooperative, admitting that he had sent money to Individual # 1 in Pakistan and that he had intended to travel to Pakistan to fight. FBI agents also conducted a search of the defendant's residence in Brooklyn, New York. During the search, agents found, among other things, a set of handwritten notes. One of the notes stated: "Do not wait for invasion, the time is for martyrdom. Martyrdom does not come to the person. The person finds martyrdom."

On September 8, 2011, a grand jury in this District returned an indictment charging the defendant with one count of providing material support to terrorists, in violation of 18 U.S.C. § 2339A(a). On January 26, 2012, the grand jury returned a superseding indictment, which included three additional counts of providing and attempting to provide materials support, consisting principally of money (some of which was to be used for weapons) and personnel. The defendant's statutory maximum sentence if convicted of all counts in the superseding indictment was sixty years' imprisonment.

II.  Guilty Plea and Related Proceedings

On April 12, 2012, after discovery had been produced but before pretrial motions had been filed, the defendant pled guilty to count two of the superseding indictment, which charged him with attempting to provide material support to terrorists, in violation of Title 18, United States Code, Section 2339A. On January 16, 2013, the Court sentenced the defendant to the statutory maximum of fifteen years' imprisonment, noting serious concerns as to the sufficiency of the sentence. On October 2, 2014, in connection with the defendant's § 2255 petition and following the government's provision of Supplemental FISA Notice (see ECF # 65), the Court permitted the defendant to withdraw his guilty plea. Following the litigation and resolution of complex pretrial motions, including the defendant's constitutional challenge to the FISA Amendments Act of 2008 ("FAA"), on June 26, 2015, the defendant pled guilty once again, this time to a superseding information charging him with providing and attempting to provide material support to terrorists, in violation of Title 18, United States Code, Section 2339A, and conspiring to provide material support to terrorists, in violation of Title 18, United States Code, Section 371. The plea agreement expressly contemplated that the defendant could be sentenced to as much as 20 years' imprisonment, and preserved the defendant's right to appeal the Court's denial of his motion to suppress the fruits of FAA surveillance as well as to appeal any sentence above fifteen years. The defendant also

stipulated to the Guidelines analysis and to the entry of a Judicial Removal Order, which will facilitate his removal to Albania at the conclusion of his sentence.

On July 16, 2015, the defendant moved, again, to withdraw his guilty plea on the basis that he had been pressured to plead guilty by one of his attorneys. (See ECF #146). On August 6, 2015, the Court denied the defendant's motion, following a hearing at which the defendant and his attorneys were present and at which the Court inquired to its satisfaction into the facts underlying the defendant's application.

### III. Guidelines Calculation

As set forth in the PSR and contemplated by the parties in the plea agreement, the defendant's Guidelines calculation is as follows:

| | |
|---|---:|
| Base Offense Level (§§ 2X1.1 and 2A1.5) | 33 |
| Plus: Terrorism Enhancement (§ 3A1.4(a)) | +12 |
| Less: Acceptance of Responsibility (§ 3E1.1) | −3 |
| Total: | 42 |

(PSR Add.) Based on the application of the terrorism enhancement, the defendant falls within criminal history category VI, resulting in a Guidelines range of 360 months to life imprisonment. However, because the statutes of conviction here provide only for up to 20 years' imprisonment, if imposed consecutively, the effective Guidelines range is 20 years. In addition, pursuant to Title 18, United States Code, Sections 3583 (e) and (j), the maximum term of supervised release with respect to count one is life.

### IV. Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;

4

>   (2) the need for the sentence imposed--
>
>>   (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>>   (B) to afford adequate deterrence to criminal conduct; [and]
>>
>>   (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

It is well-settled that, at sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

V.   Analysis

Here, there is no dispute as to the underlying material facts or the applicable Guidelines range, though the defendant argues that a below-Guidelines range sentence of fifteen years is sufficient under the circumstances. Thus, the principal question before the Court is whether and to what extent the defendant should face a sentence higher than the one originally imposed. Rarely does the government have the opportunity to revisit the sentence of a defendant with the benefit of the Court's specific guidance. In this case, the Court previously stated:

>   If it was to my own devices, if I was the prosecutor, I wouldn't have given you this deal [capped at 15 years], based on what I know, but I'm sure there is more. I think a greater sentence is more appropriate. I think in order to accurately reflect the seriousness of your conduct, a sentence would be greater than 15 years in jail. What you did is that serious a crime, that worthy of condemnation. . . . [I]n my judgment, as painful as it is to impose a 15-year sentence on you, the young man that you are with a lot of promise, in my judgment, that sentence is certainly no greater than necessary, maybe not sufficient to

5

> reflect the seriousness of your crime, but accepting the plea
> agreement, I can't go higher.

(Sent. Tr. at 34-35). To be fair, the underlying facts relating to the defendant's offense conduct have not changed. However, the Court is now able, by virtue of the terms of the plea agreement and the superseding information, to impose a higher sentence.

As the Court is aware from the government's previous submissions, the parties originally entered into a plea agreement capped at fifteen years because of important concerns relating principally to resource allocation. The government anticipated some measure of complex litigation had the case proceeded to trial, and weighed the burdens such litigation would place on the national security prosecutors and investigators involved in this and other cases against the prospect of a swift conviction and a sentence that would incapacitate the defendant for a significant period of time. Terrorism cases are especially challenging to prosecute because of the demands they necessarily place on the prosecution team and its partners.[2] Acceptance of the one count plea agreement obviated additional burdens on the national security apparatus that come with FISA litigation and CIPA practice, not to mention trial, all of which depend heavily on the assistance of investigative agencies.

As the government explained in urging the Court to accept the terms of the plea, the original plea agreement allowed the government to resolve this case and focus its resources instead on additional offenders and terrorist threats, which it did, successfully, with respect to multiple other terrorism cases brought in this district. Since the defendant withdrew his plea, and having now gone through extensive and complex pretrial litigation that diverted national security resources, resource allocation no longer weighs heavily in the balance because those resources were expended, and the parties have entered into a new plea agreement that permits the Court to carry out its previously stated wish– to impose a higher sentence for the same offense conduct.

The defendant is a capable individual who had the opportunity to lead a successful life in America. He was born and raised in Albania, in a middle-class family that remains loving and supportive to this day. (PSR ¶¶ 19-20). He attended university in Turkey and trained to become an architect. (PSR ¶¶ 21, 28). He then came to America, lawfully, in early 2008 to pursue a career as an architect. The defendant was not driven to commit criminal acts by poverty, abuse, duress, or desperation. He committed criminal acts despite a stable life in America. His personal background and characteristics do not mitigate his decision to commit crimes of international terrorism.

While the Court's original sentence of fifteen years was within a range of possible reasonable sentences, the factors set forth in 18 U.S.C. § 3553 also support the imposition of a higher sentence. As the Court has recognized, the defendant's crime

---

[2] The government seeks no sympathy for difficulties that are in part of its own making, but rather offers this explanation so the Court can fully appreciate the circumstances of the original plea, and how the circumstances have materially changed.

6

"doesn't really get much more serious . . . . it's hard to come up with a crime that we see in these courtrooms that's as serious as the one [the defendant] committed." (Sent. Tr. at 33). As the defendant acknowledged in his plea allocution, the defendant knew that he was lending support to and agreeing to lend support to jihadists who were hostile to Americans. (Plea Tr. at 33-34) ("I think it was part of a jihadi movement."). Perhaps most importantly, the need for deterrence counsels in favor of a substantial sentence. A sentence at the statutory maximum of 20 years in this case, which is substantially below the advisory Guidelines range of 360 months to life, would send a strong message to the defendant and other Americans contemplating efforts to support terrorist operations that sending aid to fund terrorist groups will not be tolerated, that efforts to join such operations will be stopped and that those who engage in such conduct face serious consequences. Moreover, a sentence of 20 years would be sufficient, but not greater than necessary, to satisfy the statutory sentencing factors.

To be clear, the government does not seek to punish the defendant for raising a novel legal challenge. The government respectfully submits that the defendant should be justly punished for his offense conduct, and that the factors that once resulted in the benefit of a bargain to him in terms of a swift resolution to his case no longer inure under the present agreement. North Carolina v. Pearce is distinguishable. 395 U.S. 711, 723-25 (1969) (holding that neither double jeopardy nor equal protection clause bars imposition of a more severe sentence upon reconviction of a defendant who had original conviction set aside, but that it would deny due process to impose a heavier sentence to punish defendant for getting his original conviction set aside); cf. Alabama v. Smith, 490 U.S. 794 (1989) (holding that there is no presumption of vindictiveness where a sentence imposed after trial was greater than that previously imposed after guilty plea).

VI. Conclusion

For the foregoing reasons, the government respectfully submits that to the extent that Court harbors lingering reservations regarding the sentence previously imposed, a sentence of 20 years' imprisonment is within the range of reasonable sentences the Court may impose, and that the factors militating in favor of a lesser sentence are no longer applicable.

Respectfully submitted,

KELLY T. CURRIE
Acting United States Attorney

By: \_\_\_\_\_/s/_____
Seth D. DuCharme
Saritha Komatireddy
Peter W. Baldwin
Assistant U.S. Attorneys
(718) 254-6021/6054/6236

cc: All counsel of record (via ECF)