LAW OFFICES OF
**DRATEL & LEWIS**

29 BROADWAY
Suite 1412
NEW YORK, NEW YORK 10006
—
TELEPHONE (212) 732-0707
FACSIMILE (212) 571-3792
E-MAIL: jdratel@dratellewis.com

JOSHUA L. DRATEL
LINDSAY A. LEWIS

FATOUMATA MAGASSA
*Paralegal*

April 17, 2023

**BY ECF**

The Honorable LaShann DeArcy Hall
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: *United States v. Hasbajrami*,
11 Cr. 623 (JG)

Dear Judge DeArcy Hall:

This letter is respectfully submitted as a second supplement to defendant Agron Hasbajrami's Post-Remand Motion for Suppression and Access to Related Discovery ("Initial Memo of Law") (ECF # 191). No sooner had we filed our February 6, 2023, Supplemental Letter (ECF # 205) to alert the Court to the November 1, 2022 publication of a 66-page (with a 16-page Appendix) redacted report by the Office of the Inspector General ("OIG") sfor the National Security Agency ("NSA"), than we became aware of *another* report, released publicly December 21, 2022, describing continuing violations in the administration of Section 702 electronic surveillance, particularly with respect to "backdoor searches," which are the subject of this remand from the Second Circuit. *See United States v. Hasbajrami*, 945 F.3d 641, 646-47, 672-77 (2d Cir. 2019). *See also* Mr. Hasbajrami's Initial Memo of Law ("Initial Memo of Law") (ECF # 191), at 1-2, 27-30.

In addition, it is counsel's understanding, based on Mr. Bachrach's conversations with Assistant United States Attorney Saritha Komatireddy, that neither AUSA Komatireddy nor AUSA David K. Kessler are assigned to this matter any longer (Mr. Kessler has left the U.S. Attorney's Office), and that AUSA Sarah Winick is now the AUSA handling the case. As a result, Mr. Hasbajrami respectfully proposes that the Court schedule a status conference. Mr. Hasbajrami's counsel are available most of May and would do our best to accommodate whatever date is most convenient to this Court.

## I. *The Most Recent Report Detailing Section 702 Querying Non-Compliance Issues*

The latest report, which remains partially redacted, the *Semiannual Assessment of Compliance with Procedures and Guidelines Issued Pursuant to Section 702 of the Foreign Intelligence Surveillance Act, Submitted by the Attorney General And the Director of National Intelligence* (“*2020 Joint 702 Assessment*”) covering the six months between December 1, 2019, and May 31, 2020 (December 2021), available at https://www.intelligence.gov/assets/documents/702 %20Documents/declassified/24th-Joint-Assessment-of-FISA-702-Compliance.pdf, issued jointly by the Department of Justice’s National Security Division (“NSD”) and the Office of the Director of National Intelligence (“ODNI”), is essentially an unclassified audit (with classified materials still redacted from the publicly released version) of the Section 702 program as implemented by the Federal Bureau of Investigation (“FBI”), Central Intelligence Agency (“CIA”), and National Security Agency (“NSA”) for essentially the first half of 2020. *See also* Dell Cameron, “The FBI’s Most Controversial Surveillance Tool Is Under Threat,” *Wired*, February 10, 2023 (“*FBI’s Most Controversial Tool*”), available at www.wired.com/story/fbi-section-702/.

The *2020 Joint 702 Report* explains that, even after a long and persistent history of non-compliance with statutory and constitutional standards (set forth in the Initial Memo of Law (ECF #191), at 50-61, 61-82, Mr. Hasbajrami’s Reply (ECF # 201), at 12-15, and in counsel’s February 6, 2023, letter (ECF #205)), “notwithstanding a focused and concerted effort by Federal Bureau of Investigation (FBI) personnel to comply with the requirements of Section 702, misunderstandings regarding FBI’s systems and FBI’s querying procedures caused a large number of query errors.” *2020 Joint 702 Report*, at 1. *See also id*., at 5 (“FBI had a significant number of compliance incidents related to querying of Section 702-acquired information”); *FBI’s Most Controversial Surveillance Tool* (*2020 Joint 702 Report* “unearthed new examples of the FBI failing to comply with rules limiting access to intelligence ostensibly gathered to protect US national security. Such ‘errors,’ they said, have occurred on a ‘large number’ of occasions”).

While “the numbers of FBI query errors, and FBI compliance incidents overall, reported during this reporting period were significantly lower than they have been in the past few reporting periods[,]” *2020 Joint 702 Report*, at 1, that was *not* necessarily the result of improved performance by FBI. Rather, “[b]ecause FBI field office reviews were suspended during a portion of this reporting period, incidents that might typically be discovered by NSD during those field office reviews were not discovered while the reviews were suspended.” *Id*., at 3 (footnote omitted).

Rather, due to the Covid-19 pandemic, “[o]nsite field office reviews were suspended in March 2020, at the onset of the coronavirus pandemic and related travel restrictions in the United States.” *Id*., at 3 n.5. Consequently, “during this reporting period, NSD was conducting field office reviews for only a little more than three months.” *Id*. Consequently, “[i]nstead, the joint oversight team conducted reviews of FBI’s application of its targeting and minimization procedures remotely.”

*Id*., at 11.[1] As a result of the suspension of field office reviews "during a portion of this reporting period, incidents that would typically be discovered by NSD during those field office reviews would not have been discovered while the reviews were suspended." *Id*., at 40 (footnote omitted).

Ultimately, the *2020 Joint 702 Report* concluded that

> The joint oversight team believes that the suspension of NSD's FBI field office reviews in March 2020 was likely a significant factor in the decrease in identified incidents.[] Notably, NSD conducted far fewer query audits than in past years. For example, in 2020, NSD conducted query audits of only six field offices, whereas NSD conducted query audits of 27 field offices in 2019 and 29 field offices in 2018.

*Id*., at 33.

Nevertheless, even with that dramatically reduced oversight, "NSD identified query compliance issues in each field office audited during this reporting period and during calendar year 2019." *Id*., at 3. Also, "since NSD resumed remote query reviews in 2021, NSD has continued to identify query compliance incidents in each field office audited." *Id*. Thus, noncompliance is pervasive as well as persistent. *See also* 43 n. 61 ("[i]n 2018, NSD identified query compliance incidents in 26 of 29 field offices audited. In 2019, query errors were identified in all 27 field offices audited, and in 2020, query errors were identified in all six offices audited").

## II. *The Continuing Lack of Compliance with Querying Standards*

The *2020 Joint 702 Report* acknowledges that "[w]hile the number of FBI compliance incidents decreased substantially compared to the previous reporting period, this assessment still reports a large number of FBI compliance incidents related to querying, and, in particular, FBI's use of 'batch queries.'" *Id*., at 30 (footnote omitted).[2] *See also id*., at 55 ("as with the previous reporting

---

[1] In addition, "[a]s a result of FBI's reduced staffing due to the coronavirus pandemic, FBI was unable to gather the information necessary to finalize two of the reports before the production to Congress of the [still classified] Section 707 Report; the remaining reports were subsequently finalized with the help of FBI and were provided to the congressional committees with subsequent Section 707 reports." *2020 Joint 702 Report*, at 11.

[2] The *2020 Joint 702 Report* adds that due to the lack of comprehensive review caused by Covid-19 restrictions, "the joint oversight team is unable to evaluate how FBI's compliance

period, a large majority of [non-compliance] incidents involved querying errors[]") (footnote omitted). CIA non-compliance with respect to minimization and querying procedures increased during the audit period, *id*., at 45, while NSA incidents decreased. *Id*., at 51.[3]

The *2020 Joint 702 Report* further concedes that "[e]ven a small number of incidents can have the potential of carrying broader implications, and a small number of actions can result in numerous incidents also having broad implications, as is the case for FBI 'batch' querying incidents." *Id*., at 31. Also, as the *Report* states, "United States persons were also impacted by minimization and querying errors during this reporting period," some of which were detailed in the *Report*, and discussed **post**, at 13-15. *Id*., at 47.[4]

---

with its querying procedures during this reporting period compares to other reporting periods." However, "NSD and ODNI do assess, however, that *query issues were a pervasive compliance challenge during the period of time covered by this joint assessment* based on the results of NSD's audits conducted during this and prior reporting periods, as well as the results of NSD's remote audits in 2021, which reviewed historical queries conducted throughout 2020." *Id*., at 33 (emphasis added). In addition, reliable data analysis remains obscured: "because of the imperfections described above, and because FBI query errors are only one factor in the overall compliance incident rate, a period-on-period comparison of the rate will still not provide an entirely accurate measure of the increase in FBI query errors." *Id*., at 35 n.52.

[3] Regarding NSA, "[a]s with prior joint assessments, query incidents remain the cause of most compliance incidents involving NSA's minimization and que1ying procedures." *2020 Joint 702 Report*, at 52. For example, during "the previous reporting period, approximately 88 percent of incidents of noncompliance with NSA's minimization and querying procedures involved improper queries[,]" and "[d]uring this reporting period, out of all of NSA's minimization and gue1ying errors, approximately 91 percent involved improper queries, . . ." *Id*.

[4] The extent to which Section 702 has swallowed the rest of FISA (and particularly "traditional" FISA, *see Hasbajrami*, 945 F.3d at 650) is apparent from the data: "In 2021, the most recent year for which data is available, there were more than 230,000 foreign targets of Section 702 warrantless surveillance. By contrast, the government obtained FISA court orders to eavesdrop on about 300 Americans or noncitizens on domestic soil." Charlie Savage, "Security Agencies and Congress Brace for Fight Over Expiring Surveillance Law," *The New York Times*, February 27, 2023, available at https://nyti.ms/3myME26. *See also* Elizabeth Goitein, "The Year of Section 702 Reform, Part I: Backdoor Searches," *Just Security*, February 13, 2023, at 1, available at bit.ly/3AeQqRD ("a series of recent government reports and FISA Court opinions have demonstrated that Section 702 has become a go-to domestic spying tool for the FBI, and that FBI agents are routinely violating statutory and court-ordered limits on accessing Americans'

The precise number of incidents of non-compliance is classified. As a result, the *2020 Joint 702 Report* expresses the frequency in relative terms. For example, instances of non-compliance related to "minimization and querying" constituted 22.7% of the total number of FBI non-compliance incidents. *Id*., at 36.[5] NSA non-compliance incidents comprised 23% of all instances of NSA non-compliance. *Id*., at 51.

### III. *None of the Recently Strengthened Protocols and Enhanced Training Regimens Were In Effect During the 2011-2012 Period at Issue In This Case*

The *2020 Joint 702 Report*, at 17, as well as a more recent four-page report released by NSD in February 2023, describe in detail enhanced training required and more restrictive protocols implemented in an effort to reduce the non-compliance associated with querying, *i.e.*, "backdoor searches," the processes pertinent to the remand in this case.

Yet *none* of these measures, which come on the heels of prior efforts, and prior urging from the Foreign Intelligence Surveillance Court ("FISC"), and which themselves have not yet proven to be successful, were in effect during 2010-2011, the relevant time period herein: *i.e.*, when the "backdoor searches" were performed in connection with the investigation that led to Mr. Hasbajrami's prosecution. *See also* Initial Memo of Law, at 26, 46.

Moreover, despite the inability of DoJ, NSA, CIA, and ODNI to implement a system that avoids material non-compliance with respect to the operation of FISA and Section 702, the *2020 Joint 702 Report* nevertheless fails to acknowledge the fundamental problems inherent in the secret, insular, unaccountable environment FISA generally, and Section 702 in particular, inhabit. *See also* Elizabeth Goitein, "The Year of Section 702 Reform, Part I: Backdoor Searches," *Just Security*, February 13, 2023, at 6 ("*Goitein: Backdoor Searches*"), available at bit.ly/3AeQqRD ("[w]hen government officials are not required to show probable cause of criminal activity to a court, it dramatically increases the risk that searches will be driven by improper considerations – including

---

data 'incidentally' collected under Section 702").

[5] Non-compliance incidents covered by the *Report* do not necessarily include every instance, or coincide temporally with the time period of the audit: "Neither the number of incidents reported [], nor the FBI query compliance incident rate [], is based on the number of compliance incidents that occurred during a given reporting period. Rather, each is based on the number of incidents that were reported to the FISC as compliance incidents during the reporting period." *Id*., at 44.

officials' conscious or subconscious prejudices or political leanings").[6]

Indeed, as the repeated attempts at reform from within (and by the FISC) themselves demonstrate, they have been unable to halt rampant non-compliance. *See also* Robyn Greene, "A History of FISA Section 702 Compliance Violations," *NewAmerica.org*, September 28, 2017, available at https://www.newamerica.org/oti/blog/history-fisa-section-702-compliance-violations/.

For example, the *2020 Joint 702 Report* asserts at the outset of the "Compliance Assessment – Findings" section that "[t]he joint oversight team finds that during this reporting period, the agencies have continued to implement their procedures and follow the guidelines in a manner that reflects a focused and concerted effort by agency personnel to comply with the requirements of Section 702." *2020 Joint 702 Report*, at 30. *See also id*. ("[p]rocesses have been put in place to implement these authorities and to impose internal controls for compliance and verification purposes").

Yet, as set forth in Mr. Hasbajrami's previous submissions, the documented record establishes otherwise. Indeed, even obtaining data has been a challenge, as "[h]ow often the F.B.I. searches for Americans' information in the 702 repository has been murky," because FBI "resisted making an estimate for years, saying that its systems – which allow agents to search many databases at once when hunting for data relevant to foreign intelligence or a crime – could not produce a reliable number." Charlie Savage, "F.B.I. Queries for U.S. Messages Collected Without Warrants Are Said to Drop 'Dramatically,'" *The New York Times*, March 3, 2023, available at nyti.ms/3KUe9vl.[7]

As that *New York Times* article points out, referring to the *2020 Joint 702 Report*, notwithstanding the existence of protocols designed to protect Fourth Amendment rights, "F.B.I.

---

[6] Ms. Goitein is Co-Director of the Liberty & National Security Program at the Brennan Center for Justice at New York University Law School.

[7] As Ms. Goitein points out with respect to the FISC's requirement that FBI provide data regarding queries of U.S. persons like Mr. Hasbajrami, "[t]he FBI failed to comply for over two years, advancing an absurd legal argument that it could satisfy the requirement by simply counting all queries (*i.e.*, including queries of non-U.S. persons)." *Goitein: Backdoor Searches*, at 4. FBI "finally began keeping the required records in 2020 after the FISA Court and FISA Court of Review rejected that argument." *Id*., *citing [REDACTED] Memorandum Opinion and Order*, (FISC September 4, 2019), at 6-8, available at https://www.intel.gov/assets/documents/702%20Documents/declassified/2018_Cert_FISC_Opinion_04Sep19.pdf.

agents have repeatedly violated those constraints and searched for other purposes, such as vetting maintenance workers or potential informants." *Id*. *See also* **post**, at 13-15.

Given the unbroken history of non-compliance with respect to Section 702 querying, repeatedly defying FISC directives and internal guidelines, the need for continual upgrades in training and monitoring only reinforce the conclusion that the system is broken, and that incremental repair is unavailing, and demonstrably insufficient to protect Fourth Amendment rights.

For instance, the *2020 Joint 702 Report* notes that:

> As part of its efforts to address certain issues causing the large number of non-compliant queries, *in June 2018*, and *in November 2019*, FBI worked with NSD and ODNI to develop updated guidance on the query provisions in FBI's procedures.

*Id*., at 17.[8]

The "enhanced training on the query restrictions in FBI's procedures was designed to address misunderstandings regarding the query standard and how to avoid non-compliant queries." *Id*. In addition, "[m]ore recently, FBI developed training focused on the query provisions in its Section 702 querying procedures, including system changes designed to address aspects of the 2018 amended querying procedures." *Id*.

Yet those serial attempts at improving compliance have proven insufficient, as the periodic amplifications of training and guidance have consistently required subsequent efforts within a short period of time. Thus, while the *2020 Joint 702 Report* points out that "[a]lthough reported to the FISC during this reporting period, some of these query incidents occurred prior to certain remedial steps taken by the FBI in late 2019[,]" *id*., at 30, additional "corrective measures" were necessary only a year later: "these query incidents occurred prior to the FBI's implementation in 2021 of significant corrective measures to prevent the query compliance issues." *Id*.

---

[8] *See also Goitein: Backdoor Searches*, at 2 ("it's doubtful that adding new layers of internal oversight will accomplish much, given the government's 15-year cycle of violations, followed by the adoption of new administrative oversight measures, followed by more violations"); *id*. ("[i]n the words of surveillance expert Julian Sanchez, the FISA Court and the government have been engaged in a game of 'compliance whackamole'") *citing* Julian Sanchez, Remarks during *PCLOB Public Forum on FISA Section 702*, January 13, 2023, available at https://www.youtube.com/watch?v=AZvaimMTqio.

NSD's February 28, 2023, four-page report to Congress, "Recent Efforts to Strengthen FISA Compliance," ("*Recent Efforts*") February 28, 2023, available at https://www.justice.gov/nsd/page file/1572036/download, catalogs even more recent training and guidance designed to promote the requisite level of compliance.

In fact, *even after* the training and guidance listed above, "[i]n 2021, after the Department of Justice (DOJ) and the Office of the Director of National Intelligence (ODNI) identified additional compliance incidents involving the querying of raw FISA information by the Federal Bureau of Investigation (FBI), FBI worked with DOJ and ODNI to institute remedial measures that have since significantly strengthened compliance." *Recent Efforts*, at 1.

Also, despite historical non-compliance, it was not until August 31, 2020, that DOJ, through a memorandum, entitled *Augmenting the Internal Compliance Functions of the Federal Bureau of Investigation*, and issued by then-Attorney General William G. Barr, that FBI was "directed [] to establish an Office of Internal Auditing (OIA) and undertake a variety of auditing, assessment, compliance, and oversight measures applicable to its national security authorities." *Id*., at 2.

Yet, even that was not deemed sufficient, as less than a year later, April 22, 2021, Attorney General Merrick B. Garland felt compelled to issue a memorandum, *Further Augmenting the Internal Compliance Functions of the Federal Bureau of Investigation*, "directing the FBI to submit to the Deputy Attorney General a detailed work plan regarding its implementation of Attorney General Barr's August 2020 memorandum and to set specific, measurable goals for implementing each of the items in the 2020 memorandum." *Recent Efforts*, at 2.

Nor were those memoranda adequate. In June 2021:

> FBI changed the default settings in the systems where it stores unminimized Section 702 information so that FBI personnel with access to unminimized FISA Section 702 information need to affirmatively "opt-in" to querying such information. This system change was designed to address the large number of inadvertent queries of unminimized Section 702 information DOJ had identified in its reviews, in which FBI personnel did not realize their queries would run against such collection. *Historically, users were automatically opted-in to querying unminimized Section 702 information in these databases if they had been authorized to access unminimized Section 702 information.*

*Id*., at 2 (emphasis added).

Also, in June 2021, "FBI instituted a policy requiring FBI attorney approval prior to conducting a "batch job" that would result in 100 or more queries[]" because "*[h]istorically, there had been some compliance incidents with the use of this tool that involved a large number of queries.*" *Id*., at 3 (emphasis added). *See also* Initial Memo of Law, at 21-22.

Furthermore, shortly thereafter, in Fall 2021,

> [A]t the direction of the FISC, the FBI modified its systems containing unminimized Section 702 information to require a case-specific justification for every query using a U.S. person query term before accessing any content retrieved by such a query from unminimized Section 702 information. *Previously, personnel were permitted to use a pre-populated common justification, when applicable, for the query.*

*Id*., at 3 (emphasis added).[9]

Following that operational adjustment, in November 2021 "DOJ, ODNI, and the FBI issued new comprehensive guidance to all FBI FISA users on the proper application of the query rules, and in December 2021, the FBI instituted new mandatory training on that guidance, which personnel were required to complete by the end of January 2022." *Id*., at 3.[10]

Again, here, in Mr. Hasbajrami's case, the Section 702 querying occurred more than a decade ago in an essentially unregulated, unmonitored, and unaccountable environment, absent any meaningful operational guidance or restrictions being imposed. Indeed, the reliance on Section 702 surveillance in Mr. Hasbajrami's case occurred *before any* of the above-listed enhanced training was

---

[9] *Recent Efforts* noted that "[t]he reduction in U.S. person queries appears to stem in part from the implementation of the 'opt-in' change, which has not only decreased the number of U.S. person queries overall but has also greatly reduced the number of inadvertent queries of unminimized Section 702 information." *Id*., at 4. Also, "based on DOJ's recent reviews, FBI appears to be conducting fewer 'batch job' queries, which has further reduced the number of U.S. person queries." *Id*.

[10] Even the most recent standards adopted by FBI have left ample room for interpretation. *Compare* Tweet, Ellen Nakashima, March 4, 2023, available at bit.ly/43sCQHw (publishing DoJ statement "in response to a request for clarification about FBI personnel's ability to query the database"), and bit.ly/43x8NyA, *with* Tweet, Elizabeth Goitein, March 6, 2023, available at bit.ly/41IkosX. Ms. Nakashima is a national security correspondent at *The Washington Post*.

implemented, *before any* of the guidance was issued, and *before any* of the restrictive measures were implemented to reduce the number of improper queries of the Section 702 database.[11]

## IV. *FBI Continues to Disingenuously Attribute Non-Compliance to "Misunderstandings"*

Among the problems in attaining a level of compliance consistent with Fourth Amendment standards and the statutory scope of Section 702 (and FISA altogether) itself is the intelligence community's refrain that non-compliance is the result merely of "misunderstandings" by those delegated the responsibility of operating the program(s). *See also* **ante**, at 2,7.[12]

For example, even after an uninterrupted string of non-compliance lasting more than a decade, the *2020 Joint 702 Report* claims that "as with the previous incident rate, the current reporting period's overall compliance incident rate was predominantly impacted by *FBI personnel misunderstanding the query standard in FBI's querying procedures*." *2020 Joint 702 Report*, at 32 (emphasis added). *See also id*., at 55 ("[m]ost of the querying incidents were caused by personnel misunderstanding the application of the query standard in the context of batch queries"); *id*., at 57 ("[d]uring this reporting period, after batch queries are removed, most of the improper query incidents resulted from FBI personnel misunderstanding the querying rules even though the queries were conducted for work-management purposes or work-related purposes").[13]

---

[11] In an illustrative example, "in 2018, Congress required the FBI to show probable cause and obtain a court order for a very small subset of U.S. person queries: those conducted in predicated criminal investigations unrelated to national security. (The subset is small in part because the FBI generally runs U.S. person queries at early stages of the investigation, *i.e.*, before they qualify as "predicated."). *Goitein: Backdoor Searches*, at 5. Yet, even though "[a]ccording to the government's figures, this requirement to obtain a court order has been triggered on more than 100 occasions since 2018[,]" *id*., nonetheless, "[b]y the government's own admission, [] *the FBI has never once complied with it*." *Id*. (emphasis added).

[12] Even when non-compliance "can be traced to a technical issue with how the FBI's systems display data," FBI "notably failed to fix [that flaw] for nearly two years." *Goitein: Backdoor Searches*, at 5. Also, "the FISA Court made clear that the violations could not all be explained by this technical issue." *Id.*

[13] The *2020 Joint 702 Report* also revealed that notwithstanding the continuing concern expressed during the past decade by the FISC, legislators, academics, and civil liberties organizations with respect to indiscriminate querying of the Section 702 database for evidence of ordinary criminal activity, FBI was nevertheless *commingling* "non-FISA acquired and unminimized FISA-acquired information" in the *same database*, and running unrestricted queries

*Recent Efforts* again parroted that rationale only weeks ago, contending that the November 2021 "guidance and mandatory training directly address misunderstandings about the rules applicable to queries of unminimized FISA information and instruct personnel on how to properly apply the query rules." *Recent Efforts*, at 3. *See also id.* ("[i]n addition, the text of FBI's Section 702 querying procedures was revised to more clearly spell out the query standard to FBI personnel").

Likewise, NSA compliance failures have also been ascribed to inadvertence. For instance, in 2011, the FISC "prohibited the NSA from conducting any U.S. person queries of data obtained through 'upstream' collection – a method of Section 702 collection that is more likely to sweep in purely domestic communications. The Court made clear that this prohibition was necessary to preserve the constitutionality of the program." *Goitein: Backdoor Searches*, at 6. *See also* Initial Memo of Law, at 16-19, 57-61.

However, "[s]everal years later, the NSA reported to the FISA Court that its agents had not been complying with this rule." *Goitein: Backdoor Searches*, at 6. While NSA "blamed the violations on 'human error' and 'system design issues[,]' the NSA's Inspector General found that 'the problem was widespread during all periods under review.'" *Id.*, at 6. Subsequently, in a 2017 opinion, the FISC "chided" NSA, *id.*, "not only for its failure to comply with the querying prohibition, but for its 'institutional lack of candor' in failing to timely report the violations." *Id.*, *citing [Redacted],* Mem. Op. (FISA Ct. Apr. 26, 2017), available at https://www.dni.gov/files/documents/icotr/51117/2016_Cert_FISC_Memo_Opin_Order_Apr_2017.pdf.

Those excuses are tired and insufficient at this point. *See also Gotein: Backdoor Searches*,

---

within it. Yet that, too, was attributed simply to a lack of understanding:

> *FBI personnel advised that they did not appreciate that queries would be running against unminimized FISA-acquired information* and, thus, would be subject to the query standard. This is particularly the case with respect to query incidents that have been identified with queries run in *a specific FBI database that contains non-FISA acquired and unminimized FISA-acquired information*. As a result, for these queries, FBI personnel did not think to apply the query standard to their proposed queries before conducting queries in that particular FBI database, or failed to opt out of conducting queries against unminimized FISA-acquired information.

*Id.*, at 59 (emphasis added).

at 8-9 ("the notion that FBI agents didn't understand the relevant standard – and that they simply need better training and oversight – is hard to accept when that standard has been in place for at least 14 years, and when the government has been touting its rigorous training and oversight throughout that period").

As Rep. Darin LaHood (R. – Ill.), a member of the House Intelligence Committee recognized in the context of a specific incident discussed **post**, at 14, the *2020 Joint 702 Report*'s "characterization of this F.B.I. analyst's action as a mere misunderstanding of querying procedures is indicative of the culture that the F.B.I. has come to expect and even tolerate." Charlie Savage, "Lawmaker Says He Was Target of F.B.I. Surveillance Material Searches," *The New York Times*, March 9, 2023 ("*Lawmaker Says He Was Target*"), available at https://nyti.ms/3GHDvLg.

Indeed, as Ms. Goitein notes, "[a]s the FISA Court suggested, there's an alternative explanation for the FBI's behavior: not just a misunderstanding of the standard, but "indifference toward it." *Goitein: Backdoor Searches*, at 8, *citing In re Foreign Intelligence Surveillance Court [Redacted],* 402 F.Supp. 3d 45, 78 (FISA Ct. 2018), *aff'd in part sub nom. In re DNI/AG 702(h) Certifications 2018, 941 F.3d 547* (FISA Ct. Rev. 2019).

## V. *Oversight by the FISC Remains Inadequate and Insufficiently Transparent*

Even as the *2020 Joint 702 Report* – and the numerous reports and FISC opinions beforehand discussed in Mr. Hasbajrami's prior submissions – concedes the non-compliance problems attendant to Section 702 querying, it also notes that once again, "[t]he FISC ultimately determined that FBI's amended querying procedures were adequate[.]" *Id*., at 5.

The *2020 Joint 702 Report* also – again – promises increased oversight, *see id*., at 6-7 (devoting an entire section to the subject) without any of the transparency that could genuinely exert a practical impact on Section 702 querying in a manner that could provide confidence that Fourth Amendment and statutory standards were being respected. Moreover, as Ms. Goitein has pointed out:

> At a more fundamental level, though, oversight – whether internal, in the form of FBI training or audits, or external, in the form of FISA Court review – is not an end in itself; it is a means to ensure that the government is following the rules. Where, as here, the rules themselves have been interpreted to permit warrantless searches of Americans' private communications, all the oversight in the world won't solve the problem.

*Goitein: Backdoor Searches*, at 2.

*Recent Efforts* also notes that while the FISC issued an opinion in April 2022, a year later it has not yet been declassified and released publicly. *Recent Efforts*, at 4. Yet *Recent Efforts* quoted from it in an effort to convince Congress that the latest measures would achieve compliance:

> [A] recent FISC opinion has recognized the compliance benefits of the new approach. As the FISC noted in an April 2022 Section 702 opinion that will shortly be released by ODNI, "the Court is encouraged by the amendments to the FBI's querying procedures and the substantial efforts to improve FBI querying practices, including heightened documentation requirements, several system changes, and enhanced guidance, training, and oversight measures. There are preliminary indications that some of these measures are having the desired effect." *See* Mem. Op. & Order at 49 (FISA Ct. Apr. 21, 2022).

*Id*. *See also* February 6, 2023, letter, at 10.

Thus, the intelligence community, when it suits its purposes (in this instance the campaign for Section 702's reauthorization before it expires at the end of 2023), publicly cites a classified opinion to which prosecutors have access but which defense counsel cannot yet review. However, "[t]hat opinion remains classified, leaving it unclear whether the court had any criticisms." Charlie Savage, "F.B.I. Queries for U.S. Messages Collected Without Warrants Are Said to Drop 'Dramatically,'" *The New York Times*, March 3, 2023, available at https://nyti.ms/3GGUHRs.

## VI. *Specific Instances of Non-Compliance Disclosed In the* 2020 Joint 702 Report

Several specific instances of non-compliance disclosed in the *2020 Joint 702 Report*, at 56-62, are disturbing, including "multiple query incidents involving FBI looking for derogatory information about individuals[,]" and "FBI personnel conducting queries of individuals whom FBI was considering approaching as sources, [REDACTED.]" *Id*., at 58.[14] Three particular episodes

[14] According to the report covering the previous six months, a specific a batch query included identifiers for "multiple current and former United States Government officials, journalists, and political commentators." *(U) Semiannual Assessment of Compliance with Procedures and Guidelines Issued Pursuant to Section 702 of the Foreign Intelligence Surveillance Act*, Submitted by the Attorney General and the Director of National Intelligence, August 2021, Reporting Period: December 1, 2018 – May 31, 2019, available at

merit mention herein.

First, in a footnote, the *2020 Joint 702 Report* notes that an intelligence analyst "conducted approximately [REDACTED] queries in [REDACTED] using only the name of a U.S. congressman." *Id.*, at 58 n. 92. The "specific facts that led the IA to conduct these queries[]" remain classified in a separate report. *Id.* Those queries, deemed "non-compliant," *id.*, "retrieved unminimized FISA-acquired information, including Section 702-acquired products that were opened." *Id.*

During a March 2023 Congressional hearing, Rep. LaHood "identified himself as that lawmaker." *Lawmaker Says He Was Target*. Thus, Section 702 served as a vehicle for querying with respect to the legislator serving as "the leader of a bipartisan working group of Intelligence Committee members who are trying to persuade Congress to reauthorize the warrantless surveillance law in question, known as Section 702." *Id.*[15] It is not feasible to chalk up that conduct to any "misunderstanding."[16]

Similarly, "[i]n one query incident, FBI queried the names of a local political party to determine if the party had connections to foreign intelligence." *2020 Joint 702 Report*, at 58. Yet that query "was not reasonably likely to retrieve foreign intelligence information." *Id.*

Predictably, the *2020 Joint 702 Report* concluded that both "errors" were the product of a "misunderstanding" of FISA authority. *Id.*, at 58-59. *See also FBI's Most Controversial Tool* ("DOJ explained the errors away by saying FBI personnel 'misunderstood' the search procedures, adding they were 'subsequently reminded of how to correctly apply the query rules'").

---

https://www.intel.gov/assets/documents/702%20Documents/declassified/22nd_Joint_Assessment_of_FISA_702_Compliance_CLEARED_REDACTED_FOR_PUBLIC_RELEASE.pdf.

[15] *See also* Edward C. Liu, "Reauthorization of Title VII of the Foreign Intelligence Surveillance Act," *Congressional Research Service*, March 17, 2023, available at https://crsreports.congress.gov/product/pdf/R/R47477; *Goitein: Backdoor Searches*, at 1 (intelligence agencies are "endeavoring to rebrand Section 702 as a cybersecurity authority, recognizing that the specter of terrorism no longer serves as a trump card in any conversation about reforms").

[16] Rep. LaHood, who supports reauthorization of Section 702, nevertheless called "the queries about communications involving a member of Congress an egregious violation that betrayed trust in government surveillance power and could be 'seen as a threat to the separation of powers.'" *Lawmaker Says He Was Target*.

Another set of queries that "NSD determined lacked an authorized purpose[]" involved an FBI analyst's queries in 2016-2017[17] related to an investigation

> based on a witness's report that a vehicle driven by an individual of Middle Eastern descent sped into the parking lot and began honking the horn. A second individual of Middle Eastern descent came out of the apartment complex, and the individuals began loading boxes into a second vehicle. The witness reported that some of the boxes were labeled 'Drano,' and that there were also 'white containers which appeared to be upside down with black screw tops in the box.' The witness stated that the individuals acted very quickly.

*2020 Joint 702 Report*, at 61.

**Conclusion**

Accordingly, for the reasons set forth below, as well as those in Mr. Hasbajrami's Initial Memo of Law, Reply, and February 6, 2023, Supplemental Letter, it is respectfully submitted that Mr. Hasbajrami's motion should be granted in its entirety, the fruits of the warrantless backdoor querying suppressed, and the prosecution against Mr. Hasbajrami dismissed in its entirety, and/or the pertinent classified materials, including that in the government's Memo of Law (ECF # 196) and other submissions, should be disclosed to security-cleared defense counsel so that defense counsel may aid this Court in discerning the accuracy and veracity of the government's classified statements, and afford Mr. Hasbajrami his right to Due Process.

Furthermore, since the case has had a complete turnover of Assistant United States Attorneys

---

[17] NSD did not make that determination until it performed its audit in 2019.

assigned to this case during the course of the remand proceedings, counsel respectfully submit that an *in camera* status conference would be appropriate.

Respectfully Submitted,

Joshua L. Dratel
Michael K. Bachrach

*Attorneys for Defendant Agron Hasbajrami*

JLD/